911 P.2d 116

**Jody IPSEN, Appellant–Appellant,**

v.

**Lorraine AKIBA,[1] Director of the Department of Labor and Industrial Relations, and McCaw RCC Communications, Inc., Appellees–Appellees.**

**No. 17034.**

Intermediate Court of Appeals of Hawaiʻi.

Feb. 14, 1996.

---

**1.** The present case was initiated prior to Lorraine Akiba's January 1995 appointment to the position of Director of Labor and Industrial Relations. Pursuant to Hawaiʻi Rules of Appellate Procedure Rule 43(c)(1), Akiba has been substituted automatically for Keith Ahue, Akiba's predecessor, as a defendant in the present action.

Barbara A. Fabrey (Charles H. Hite on opening and reply briefs), Legal Aid Society of Hawaii, on the briefs, Honolulu, for appellant.

Wilfredo O. Tungol, Karin L. Holma–Oshiro, Deputy Attorneys General, on the brief, Honolulu, for appellees.

Before BURNS, C.J., and WATANABE and ACOBA, JJ.

ACOBA, Judge.

Appellant Jody Ipsen (Appellant) appeals from the circuit court's March 29, 1993 Order affirming the decision of an employment security appeals officer (the appeals officer), dated August 24, 1992. The appeals officer's decision, in turn, had sustained the July 17, 1992 decision of a Hawai'i Department of Labor and Industrial Relations (DLIR) claims examiner (the claims examiner), denying Appellant unemployment benefits. We affirm.

## I.

The record on appeal includes the claims examiner's decision with unverified "summar[ies] of factfinding interview[s]" [2] con-

2. The claims examiner's decision disqualified Appellant from benefits because Appellant terminated her job for "personal, non-compelling reasons and without good cause." Included in the claims examiner's report were summaries of factfinding interviews with Appellant, Steve Hughes (Hughes), a director of McCaw RCC Communications, Inc. (Appellant's former employer), and Dallas Fowler (Fowler), Appellant's immediate supervisor.

The bottom of each "summary of factfinding interview" page contained the following paragraph in small print: "I have read the foregoing statement and it is true and correct to the best of my knowledge. I have given the above informa-

ducted by telephone, and the transcript of a subsequent August 20, 1992 appeals hearing (the hearing) at which Appellant and her witness Deborah Mortimer (Witness) testified. No one appeared at the hearing on behalf of McCaw RCC Communications, Inc. (McCaw), Appellant's former employer.

At the hearing, Appellant and Witness were both sworn by the appeals officer. The appeals officer stated that the claims examiner's decision and interview summaries would be made a "part of the record of this [appeals] proceeding" and the "information contained therein" could be "consider[ed]" by him. However, the appeals officer qualified his statement by adding that he would "consider such information ... only in the context of the testimony" he would be hearing. Referring to the proceeding as "a *de nolo* [sic] hearing," the appeals officer informed Appellant he would decide the case "on the issues that [were] brought to [his] attention during the hearing, rather than those that may or may not have been considered by the [claims] [e]xaminer." [3] Appellant did not object to any of the appeals officer's statements.

We set forth the facts based on the sworn testimonies of Appellant and Witness.

Appellant was hired as a sales representative by McCaw on May 15, 1991. After a break in her employment because of an automobile accident, Appellant was rehired on March 16, 1992. She was an employee of McCaw from March 16, 1992 to June 8, 1992.

Around March 1992, Appellant learned that another company was acquiring McCaw. At that time, although McCaw's inventory was being depleted, the management exerted more pressure on the sales staff to increase its monthly sales quota. During this period, Appellant and her co-workers were encouraged to leave and to seek other employment opportunities. Employees were advised, in writing, "to dust off [their] resume[s]" and "seek help from an employment agency." Appellant and other employees were concerned about job security.

On May 20, 1992, Appellant injured her ankle, and her physician advised her to refrain from working until June 8, 1992. Appellant's immediate supervisor, Dallas Fowler (Fowler), was skeptical of Appellant's injury, called her injury a "scam" and led other employees to believe that her absence would adversely affect their compensation. Fowler also repeatedly called both Appellant and her physician to inquire about her physical condition and her expected date of return.

Immediately before returning to work, Appellant decided, based on her own appraisal of the work environment and her supervisor's attitude towards her, to resign from her position. Her June 8, 1992 resignation letter described Fowler's treatment of her as "abusive, insulting, and impetuous." [4] Appellant

tion for the purpose of obtaining unemployment benefits, knowing that the law provides penalties for false statements or withholding material facts." The claims examiner's signature follows the "verification paragraph" on each page. Appellant, Hughes and Fowler did not sign any of the statements.

3. We assume the appeals officer was referring to a *"de novo"* hearing. *But see* Hawai'i Administrative Rules (HAR) § 12–5–93(e)(17) (at an appeals hearing, "[o]ral or written evidence of any nature, whether or not conforming to the legal rules of evidence, may be accepted. Any official record of the department, including reports submitted in connection with the administration of the employment security law, may be included in the record; provided, however, that the parties are given an opportunity to examine and refute the same.").

4. Fowler stated that he never harassed Appellant, but only paged her three times for the legitimate purpose of determining her medical status. According to Fowler, Appellant never complained to him or his supervisor, Robert Florentino (Florentino), regarding the alleged harassment. Fowler insisted that he only called Appellant regarding her status because she never returned his calls. He also offered her a position answering phones, so she would not need to stand on her injured ankle. At the appeals hearing, Deborah Mortimer, Appellant's witness, confirmed that this offer was made. Fowler explained that he only called Appellant's doctor three times because (1) he was under a direct order from the mainland corporate office to find out when Appellant could resume work, (2) the doctor failed to return the first two calls, and (3) he had to determine whether he needed to hire a new person while Appellant was out.

Fowler also insisted that, while he passed out an employment agency's card, he never discharged any staff since the new takeover company was likely to retain all employees.

did not feel she could appeal to Fowler's supervisor, general manager Robert Florentino (Florentino), because he was rarely available.[5]

After resigning, Appellant applied for unemployment benefits. On July 17, 1992, the claims examiner determined that Appellant had voluntarily terminated her employment for personal reasons and without good cause and, therefore, was ineligible for benefits. Appellant appealed the claims examiner's decision.

The appeals officer found that the conditions of Appellant's employment had deteriorated substantially following her injury, that Fowler's conduct was "unreasonably accusative and demeaning," and that Appellant was "without fault in the matter." According to the appeals officer, "had this adversarial relationship persisted, without a diligent effort on the part of the supervisor to effect a reconciliation, claimant could not have been expected to continue her employment."

The appeals officer, however, determined that Appellant failed to prove that she acted as "a reasonable and prudent worker, genuinely and sincerely desirous of maintaining employment[,]" because Appellant decided to terminate her employment without "either appealing to an [sic] higher authority, or making at least a minimal effort to determine if the conditions of her employment would be as adverse as she expected." Furthermore, the appeals officer noted that Appellant had not secured an alternative employment offer prior to her termination.

Concluding that she had failed to demonstrate a "compelling reason" for leaving her job, the appeals officer affirmed the denial of benefits and denied Appellant's request for reconsideration. Appellant subsequently appealed to the circuit court, which affirmed the appeals officer's decision.

5. In his interview with the claims examiner, Fowler contradicted Appellant's statements. Fowler indicated that Florentino was available on a twenty-four-hour basis and could be reached through his pager with a message printout when he was not in the office.

6. Hawai'i Revised Statutes (HRS) § 91–14(g)(5) (1993) directs that:

The appeals officer based his August 24, 1992 decision denying benefits on Hawai'i Revised Statutes (HRS) § 383–30(1) (1993) and Hawai'i Administrative Rules (HAR) § 12–5–47. HRS § 383–30(1), which is part of the Hawai'i Employment Security Law, commonly referred to as the "unemployment compensation" statute, provides that an individual shall be disqualified from unemployment compensation benefits "[f]or any week beginning on and after October 1, 1989, in which the individual has left the individual's work voluntarily without good cause[.]" HAR § 12–5–47 similarly provides that "[a]n individual shall be disqualified for benefits for voluntarily leaving work without good cause."

## II.

On appeal from a circuit court's review of an administrative decision, this court will employ the same standard of review applied by the circuit court. *Dole Hawaii Div.–Castle & Cooke, Inc. v. Ramil,* 71 Haw. 419, 424, 794 P.2d 1115, 1118 (1990) (citations omitted). The reviewing court assesses the agency's findings of facts under the clearly erroneous standard. *Wailuku Sugar Co. v. Agsalud,* 65 Haw. 146, 148, 648 P.2d 1107, 1110 (1982); HRS § 91–14(g)(5).[6] Under the clearly erroneous standard, the reviewing court will overturn an agency's findings of fact only if the court is left with a "definite and firm conviction that a mistake has been made." *Wharton v. Hawaiian Elec. Co.,* 80 Hawai'i 120, 122, 906 P.2d 127, 129 (1995) (quoting *Bumanglag v. Oahu Sugar Co.,* 78 Hawai'i 275, 279, 892 P.2d 468, 472 (1995)). *Cf. State v. Okumura,* 78 Hawai'i 383, 392, 894 P.2d 80, 89 (1995). On the other hand, an agency's legal conclusions are freely reviewable. *Wharton,* 80 Hawai'i at 122, 906 P.2d at 129; *Tate v. GTE Hawaiian*

[u]pon review of the record the court may affirm the decision of the agency or remand the case with instructions for further proceedings; or it may reverse or modify the decision and order if the substantial rights of the petitioners may have been prejudiced because the administrative findings, conclusions, decisions, or orders are ... [c]learly erroneous in view of the reliable, probative, and substantial evidence on the whole record[.]

*Tel. Co.*, 77 Hawai'i 100, 102–03, 881 P.2d 1246, 1248–49 (1994).

### III.

We first turn to the question of whether Appellant voluntarily quit her employment.

On appeal, Appellant alleges that she did not voluntarily terminate her job, but rather quit because of the treatment by Fowler, who openly regarded her ankle injury as a "scam." Appellant contends that Fowler's actions were "coercive to the point of compelling an involuntary resignation" from her.

However, the question of whether a leaving was voluntary or involuntary may often overlap with facts related to whether there was "good cause" to leave. Thus, a leaving may be determined to be "involuntary," based on facts also establishing "good cause" to leave. We are aware of cases employing the concept of "constructive discharge," but whether a person has been constructively discharged also rests on the determination of dual issues of voluntariness and "cause." Hence, the concept of a "constructive discharge" is not necessarily helpful in isolating the issue of whether an employee's leaving was voluntary.

We believe it more fruitful from an analytical perspective and in light of HAR § 12–5–47(b), *see* discussion *infra*, to evaluate the issues of voluntariness and "good cause" separately. Consequently, we agree generally with the following statement:

> The notion of voluntary quitting without good cause involves two levels of volition: (1) the immediate circumstances of leaving must reflect a subjective [7] intent of the employee to terminate; and (2) the act of leaving must be an exercise of free will and not the product of other compelling reasons or pressures forcing him to leave. It

is the second level of volition that concerns the ultimate issue of whether or not the employee has quit for good cause.

David R. Packard, *Unemployment Without Fault; Disqualification for Unemployment Insurance Benefits*, 17 Vill.L.Rev. 635, 641 (1972) (footnote added). Thus, in determining whether Appellant "voluntarily" quit, we are concerned with whether the circumstances reflect an intent [8] on the part of the employee to terminate employment. On the other hand, the question of whether there were compelling reasons which forced an employee to leave is properly analyzed under the "good cause" prong of the statutory standard.

This approach is consistent with HAR § 12–5–47(b) which was adopted to implement the statute. HAR § 12–5–47(b) states that an employment separation is considered "a voluntary leaving when the facts and circumstances demonstrate that a claimant is the 'moving party' in the termination of an employment relationship." Voluntary separation is to be contrasted with a "discharge." Under HAR § 12–5–51(a), "[a] discharge occurs when [conversely] an employer is the 'moving party' in the termination of the employment relationship." "Moving" is the present participle of the verb "move." The definitions of "move" include "to change position or posture, to take action." *Webster's Collegiate Dictionary* 761 (10th ed. 1993). The word "move" from which "moving" is derived "is very general and implies no more than the fact of changing position." *Id.* The appeals officer found that Appellant was the "moving party" in terminating her employment. We conclude that the hearing officer's finding has support in the record.

At the hearing, Appellant admitted that she had resigned [9] and had submitted a letter of resignation.[10] It is undisputed that Appel-

---

7. Under HAR § 12–5–47(b), we would not be limited to subjective evidence of intent.

8. Because HAR § 12–5–47 refers to the "facts and circumstances" surrounding the termination, the evaluation of the intent of the claimant to terminate should include not only subjective evidence but objective evidence of an intent to terminate.

9. [APPEALS OFFICER]: The first thing I'd like to ask, if it was indeed correct that you uh, resigned as opposed to being discharged. [APPELLANT]: That's correct.

10. [APPEALS OFFICER]: All right, now when you decided to quit and submitted this letter of resignation, how did you submit it? [APPELLANT]: Uh, I walked in person on June 8th when the doctor re—uh, had said I

lant did not attempt to return to work after her physician released her. While Appellant testified that she felt harassed by Fowler, she indicated that her ankle injury and the lack of job security were also reasons for quitting:

> [APPEALS OFFICER]: [L]et me know what caused you to feel compelled to quit.
>
> [APPELLANT]: Okay. Um, we found out that [another company] was gonna [sic] be buying [McCaw]. And at that time, um, my job security became very volatile. Um, *I asked [sic] to seek employment elsewhere,* I was given a business card of uh, an employment agency to seek out employment. Um, in the office the tensions became very high.... [T]he management was getting edgy. Uh, there was one time when Robert Florentino, the general manager, came in and exploded in the office at all the sales staff.... *I felt ... that there was no job security there.* Um, and it was becoming more and more difficult to come into work and—and to carry out a normal work day.... Um, *on top of that um, I injured my ankle....*

(Emphases added.)

Additionally, although Appellant maintained that Fowler "abused and humiliated [Appellant] regularly," Witness related that Fowler actually "wanted [Appellant] to come back [to work] just to answer phones."[11]

Finally, while the hearings officer indicated that Appellant "was without fault" in her relationship with Fowler, he did not find that, at the point Appellant quit, she "could not have been expected to continue her employment."[12] These circumstances would support a finding that the employee intended to terminate employment. Considering the evidence before the appeals officer, we cannot say that the officer's finding that Appellant was "the moving party in the termination of the employment relationship" was clearly erroneous or that we are left with "a definite and firm conviction that a mistake has been made." *See Wharton,* 80 Hawai'i at 122, 906 P.2d at 129.

### IV.

■ Appellant argues that the appeals officer improperly placed the burden of establishing that she quit with good cause on her. She asserts that this conflicts with the intent of the Hawai'i unemployment compensation statute and Hawai'i case law.

■ Initially, we agree with Appellant that the unemployment compensation statute should be liberally construed.

> The unemployment compensation statute was enacted for the beneficent and humane purpose of relieving the stress of economic insecurity due to unemployment. It should therefore be liberally construed to promote the intended legislative policy. In view of the basic policy of the statute of protecting the worker from the hazard of unemployment, our courts must view with caution any construction which would narrow the coverage of the statute and deprive qualified persons of the benefits thereunder.

*Camara v. Agsalud,* 67 Haw. 212, 216–17, 685 P.2d 794, 797 (1984) (citations omitted). But Appellant maintains that in light of the policy reasons for the statute, the employer should "shoulder the burden of disqualification under HRS § 383–30, even when the reasons underlying the termination of employment are within the control of the claimant."

---

could go back to work. Um, that was on a Monday. I had all weekend to think about what I'd planned on doing. And the thought of going to work on Monday just made me cringe, you know.... [W]e had no equipment to sell to the customers, they were constantly yelling at us. They were raising their sales quota higher because people weren't showing up, they were demanding more from us but not giving us anything to sell to the customer.

**11.** [WITNESS]: [Fowler] wanted her to come back just to answer phones, and she wouldn't be walking around, because she wasn't supposed to be on her foot. Uh, that's incorrect. Because ... what he wanted her to do was uh, work as a[n] inside sales rep. Answering the phones is part of it, but it does include getting up, going to the front, talking with people, and ... walking around[.]

**12.** The hearings officer stated, *"Had this adversarial relationship persisted,* without a diligent effort on the part of the supervisor to effect a reconciliation, [Appellant] could not have been expected to continue her employment."

(Emphasis added.)

Our review of the legislative history of the unemployment compensation statute, however, fails to disclose any legislative intent that an employer should bear the burden of proving good cause when an employee voluntarily terminates employment. On the contrary, in enacting HRS § 383-30, the legislature intended "to ensure that *benefits are paid only to those claimants who are involuntarily unemployed through no fault of their own,* to provide the means to detect and prevent fraudulent claims, and to provide adequate financing of the Unemployment Insurance Trust Fund to restore its solvency." Sen. Stand.Comm.Rep. No. 352, in 1976 Senate Journal, at 1037 (emphasis added). The unemployment compensation law "was established to mitigate the effects of sudden or extended unemployment on the involuntarily employed [and therefore], *eligibility for benefits should not be automatic for the worker who by his [or her] actions, creates his [or her] own unemployment.*" Hse. Stand.Comm.Rep. No. 776, in 1976 House Journal, at 1648 (emphasis added). This legislative statement does not evince a policy that the employer should prove the employee's ineligibility "even when the reasons underlying the termination of employment are within the control of the claimant." Rather, the statement is consistent with requiring Appellant to prove that when she voluntarily terminated her job, she did so with good cause.

This court previously held that under HRS § 383-30(1), an employee who voluntarily terminates employment has the burden of establishing that such action was with good cause. *Noor v. Agsalud,* 2 Haw.App. 560, 562, 634 P.2d 1058, 1060 (1981). In *Noor,* the

appellant challenged a circuit court order upholding a determination that she was disqualified from unemployment benefits under HRS § 383-30(1) because she had voluntarily left her job without good cause. *Id.* at 560, 634 P.2d at 1059. There, the referee found that Noor's stressful job, combined with her own personality patterns, could result in harm to her physical and mental well-being. *Id.* Nevertheless, the referee concluded that Noor had left work without good cause, since she sought neither available counseling nor a transfer to other open positions within her employer's organization. *Id.* at 560–61, 634 P.2d at 1059.

On appeal, this court affirmed, holding that an employee who voluntarily leaves employment carries the burden of establishing good cause for leaving. "Once the separation has been termed a voluntary leaving on the basis of circumstances surrounding the departure, the 'good cause' exception must be explored. *In the case of voluntary quitting, the employee has the burden of establishing that his [or her] leaving was with good cause.*" *Id.* at 563–64, 634 P.2d at 1060 (emphasis added) (footnote omitted) (quoting David R. Packard, *supra,* at 639). Appellant incorrectly asserts that *Noor* is no longer controlling in the application of HRS § 383-30(1). On the contrary, *Noor* remains viable authority in applying HRS § 383-30(1) and was not overruled by *Dole Hawaii Div.–Castle & Cooke, Inc. v. Ramil,* 71 Haw. 419, 794 P.2d 1115 (1990), as Appellant maintains.

In *Dole,* the employer sought to disqualify its employees from receiving unemployment benefits under HRS § 383-30(4) (1993)[13] because they had rejected recall offers to work. HRS § 383-30(4) deals specifically with stop-

---

13. HRS § 383-30(4) (1993) provides that an individual shall be disqualified for benefits:

(4) Labor dispute. For any week with respect to which it is found that the individual's unemployment is due to a stoppage of work which exists because of a labor dispute at the factory, establishment or other premises at which the individual is or was last employed; provided that this paragraph shall not apply if it is shown that:

(A) The individual is not participating in or directly interested in the labor dispute which caused the stoppage of work; and

(B) The individual does not belong to a grade or class of workers of which, immedi-

ately before the commencement of the stoppage, there were members employed at the premises at which the stoppage occurs, any of whom are participating in or directly interested in the dispute; provided that if in any case separate branches of work, which are commonly conducted in separate businesses in separate premises, are conducted in separate departments of the same premises, each such department shall, for the purpose of this paragraph, be deemed to be a separate factory, establishment, or other premises.

page of work due to labor disputes. The employer maintained that when the employees "rejected the recall offers to work, lack of work ceased to be the basis for their unemployment." *Id.* at 425, 794 P.2d at 1118. The claimants in *Dole* argued that they rejected the recall offers because the positions offered were vacant as the result of a strike. *Id.* On appeal, the Hawai'i Supreme Court upheld the referee's award of benefits, concluding that "Dole ha[d] failed to meet its burden of proving a continuing employment relationship with [c]laimants at the time of the recall, a prerequisite to disqualification *under the labor dispute provision, HRS § 383–30(4)*." *Id.* at 432, 794 P.2d at 1122 (emphasis added).

In essence, *Dole* addressed the burden of proof required under HRS § 383–30(4) when an employer attempts to disqualify employees from benefits during a labor dispute. *Noor, supra,* on the other hand, applied HRS § 383–30(1) in a situation where an employee voluntarily quit working. *Dole* and *Noor* are not inconsistent; they relate to different situations.

■ The Hawai'i Supreme Court has distinguished disqualification for unemployment benefits under HRS § 383–30(4) from disqualification pursuant to HRS § 383–30(1). *Inter–Island Resorts, Ltd. v. Akahane,* 46 Haw. 140, 156, 377 P.2d 715, 724 (1962).

The consensus supports the conclusion that the two disqualification provisions are mutually exclusive and that an individual whose unemployment is due to a "stoppage of work" which exists because of a "labor dispute" cannot be said to have "left his [or her] work voluntarily" within the meaning of the voluntary separation provision.

*Id.* (citation omitted). Under HRS § 383–30(4), the individual's unemployment is due to "a 'stoppage of work' which exists because of a 'labor dispute.'" *Id.* In such a case, the individual employee cannot be said to have brought about or have control over his or her termination. Thus, where the employer seeks to terminate benefits in that situation, the employer should properly carry the burden of establishing the basis for denying benefits. On the other hand, where the employee voluntarily terminates employment in the non-labor dispute situation, proof of voluntariness and good cause should rest with the employee, since the employee's own resignation or quitting brought about the separation from employment. Hence, Appellant's contention that *Dole, supra,* should control in this case is not persuasive. We hold, therefore, that where an employee voluntarily quits employment under HRS § 383–30(1), the employee has the burden of proving that his or her leaving was with good cause.

## V.

■ On the issue of whether Appellant had "good cause" to leave, we refer to HAR § 12–5–47(c) which sets forth the factors constituting "good cause" for a voluntary termination of employment. HAR § 12–5–47(c) in pertinent part states:

(c) Generally, a leaving of work is considered to be for a good cause where it is for a real, substantial, or compelling reason, or a reason which would cause a reasonable and prudent worker, genuinely and sincerely desirous of maintaining employment, to take similar action. *Such a worker is expected to try reasonable alternatives before terminating the employment relationship.*

(Emphasis added.)

While HAR § 12–5–47(c) was not in effect at the time this court decided *Noor, supra,* the court, nonetheless, held that the employee had a duty to explore reasonable alternatives for the solution of employment problems before "good cause" could be found:

*We hold that an employee,* even prior to the adoption of the regulation, *had the duty to try reasonable alternatives for the solution of his or her problem with the employer's organization prior to terminating employment. Reasonable alternatives would include at least consulting the employer and attempting to find some means of solution to the problems.* Here, the record is clear that no such attempt was made by the appellant.

*Noor,* 2 Haw.App. at 563, 634 P.2d at 1059 (emphases added).

In this case, the appeals officer found, in effect, that Appellant failed to meet the

"good cause" test. Appellant testified that she did not consult or attempt to contact Florentino, the general manager, regarding Fowler's conduct.

> [APPELLANT]: I know I didn't have a job prior to that, I didn't call Robert Florentino, which [sic] is the general manager. He was usually unavailable in the office, [sic] he was out most of the time on the mainland, in a car accident [and] . . . he was barely around. I—I—I rarely even acknowledged him as my boss um, because he was not around often. Um, so during the weekend, I wrote him my resignation letter and went in on Monday and just resigned. It was about 10:30 in the morning.

Appellant does not dispute that she made no effort to work out the problems, but argues that such an attempt would have been futile. She maintains that she could not have reconciled with Fowler, and that any appeal to Florentino would have been unavailing because of his frequent absences.

However, the appeals officer found that even if Florentino was only physically present in the office on a few occasions, it would have been reasonable for Appellant to contact Florentino by telephone or pager to explore some reasonable alternatives for resolving the conflict between Appellant and Fowler. Appellant presented no evidence that Florentino was biased against her or that he was trying to avoid her. Under the circumstances, we cannot conclude that the obligation on Appellant to at least consult her employer and attempt to explore reasonable solutions to her employment problems was unreasonable. The record is clear that prior to terminating her employment, Appellant failed to make any attempt to find reasonable alternatives to quitting as expected under HAR § 12–5–47(c).

### VI.

█ Finally, Appellant apparently contends that the appeals officer's finding that Appellant failed to "assure" herself of alter-native employment before resigning, was irrelevant to a determination in the instant case. Based on the facts presented, we agree.

HAR § 12–5–47 in pertinent part, provides:

> Good cause for leaving employment may be found where there is:
>
> . . . .
>
> (5) Acceptance of a definite, firm offer made of other employment where the offer is subsequently withdrawn and the former employer refuses to rehire the employee[.]

We concur that because there was no evidence in this case that Appellant had received and accepted another employment offer,[14] this alternative employment factor was not relevant in determining whether Appellant quit work with good cause. However, this factor was only one of the factors considered. The appeals officer's decision was based on other findings, namely, that Appellant quit work without appealing to a higher authority and did not make a minimal effort "to determine if the conditions of her employment would be as adverse as she expected[.]" These findings were sufficiently dispositive to disqualify her from benefits.

### VII.

For the foregoing reasons, the order of the circuit court affirming the appeals officer's denial of benefits is affirmed.

BURNS, Chief Judge, concurring.

I agree with Judge Acoba's opinion. I write separately solely because I have questions about a recent Hawai'i Supreme Court case quoted in Judge Acoba's opinion.

The definition of "clearly erroneous" was stated by the Hawai'i Supreme Court on May 4, 1995, in *State v. Okumura,* 78 Hawai'i 383, 894 P.2d 80 (1995) as follows:

> resign. And *I know that I didn't have a job prior to that,* I didn't call Robert Florentino, which [sic] is the general manager."
> (Emphasis added.)

---

**14.** Appellant testified that she did not have a firm offer of employment before she quit work:
  "[APPELLANT]: [I]t was at that point over the weekend that I thought, I'm just gonna [sic]

A finding of fact is clearly erroneous when (1) the record lacks substantial evidence to support the finding, or (2) despite substantial evidence in support of the finding, the appellate court is nonetheless left with a definite and firm conviction that a mistake has been made.

78 Hawai'i at 392, 894 P.2d at 89 (citation and quotation marks omitted).

Another definition of "clearly erroneous" was stated by the Hawai'i Supreme Court on November 15, 1995, in *Wharton v. Hawaiian Elec., Inc.,* 80 Hawai'i 120, 906 P.2d 127 (1995) as follows:

[A]ppeals taken from findings [of fact] set forth in decisions of the Board are reviewed under the clearly erroneous standard. Thus, the court considers whether such a finding is [c]learly erroneous in view of the reliable, probative, and substantial evidence on the whole record[.] The clearly erroneous standard requires this court to sustain the Board's findings unless the court is left with a firm and definite conviction that a mistake has been made.

80 Hawai'i at 122, 906 P.2d at 129 (citation omitted).

*Okumura* is a criminal appeal. *Wharton* is an agency appeal. As applied, is there a difference between their definitions of "clearly erroneous?" If so, what is the difference, and why is there a difference? If not, why is the *Wharton* wording of the definition different from the *Okumura* wording of the definition?