933 P.2d 1339

Sally J. HARDIN, Appellant–Appellee,

v.

Lorraine H. AKIBA, in her capacity as Director of Labor and Industrial Relations, Appellee–Appellee,

and

United Airlines, Appellee–Appellant.

No. 19230.

Supreme Court of Hawai'i.

Feb. 28, 1997.

Kirk H. Cashmere, on the briefs, Honolulu, for appellant-appellee, Sally Hardin.

Frances E.H. Lum, Deputy Attorney General, on the briefs, Honolulu, for appellee-appellee, Lorraine H. Akiba, Director of Department of Labor and Industrial Relations.

Joseph A. Kinoshita, on the briefs, Honolulu, for appellee-appellant, United Airlines.

Before MOON, C.J., and KLEIN, LEVINSON, NAKAYAMA and RAMIL, JJ.

## OPINION

MOON, Chief Justice.

Appellee-appellant United Airlines (United) appeals from the First Circuit Court's May 12, 1995 Decision and Order holding that appellant-appellee Sally J. Hardin is entitled to unemployment insurance benefits. On appeal, United contends that Hardin is not entitled to unemployment insurance benefits because: (1) Hardin provoked her own discharge, thus compelling the conclusion that she, in effect, quit her employment; and (2) assuming Hardin did not quit but, rather, was discharged, she was discharged for misconduct connected with her work. Appellee-appellee Lorraine H. Akiba, in her capacity as Director of the Department of Labor and Industrial Relations [hereinafter, the DLIR] contends that Hardin is disqualified for unemployment insurance benefits because she was discharged for misconduct connected with her work. Hardin, on the other hand, contends that the circuit court properly determined that she was eligible for unemployment benefits, but erred in not awarding her attorneys' fees.

For the reasons discussed below, we hold that Hardin was discharged for misconduct connected with her work, thus disqualifying her for unemployment insurance benefits. Accordingly, we vacate the judgment of the circuit court and remand for entry of judgment in favor of United.

## I. BACKGROUND

Hardin worked as a reservationist for United for twenty-six years—from June 3, 1968 to June 28, 1994. Beginning in 1990, Hardin suffered from numerous medical problems that required her to miss a significant amount of work.

As a consequence of her lack of dependability, Hardin progressed through United's formal disciplinary process, receiving a "No-

tice of Concern,"[1] a "Warning Notice,"[2] and a "Final Notice."[3] In addition, Hardin received numerous formal and informal counseling sessions. The following chronology summarizes Hardin's attendance record, counseling sessions, and disciplinary warnings between June 3, 1990 and June 28, 1994:

| Date | Attendance Record | | Counseling/Warnings |
|------|------|------|------|
| 06/03/90 | Ill | 1 day | |
| 09/29/90 | Ill | 3 days | |
| 11/24/90 | Ill | 1 day | |
| 12/15/90 | Ill | 12 days | |
| | | | |
| 01/07/91 | | | Informal Counseling |
| 01/09/91 | | | Informal Counseling |
| 01/13/91 | Ill | 2 days | |
| 01/26/91 | Ill | 1 day | |
| 01/30/91 | | | Formal Counseling |
| 01/31/91 | | | **Notice of Concern** |
| 03/30/91 | Ill | 10 days | |
| 04/22/91 | | | Formal Counseling |
| 06/07/91 | Late | 13 minutes | |
| 07/26/91 | Ill | 12 days | |
| 08/02/91 | | | Informal Counseling |
| | | | **Warning Notice** |
| 12/08/91 | Ill | 32 days | |
| | | | |
| 05/10/92 | Ill | 5 days | |
| 05/17/92 | | | Informal Counseling |
| 08/15/92 | Late | 4 hrs 50 min | Informal Counseling |
| 11/16/92 | Ill | 2 days | |
| 11/24/92 | Ill | 2 days | |
| 12/02/92 | | | Formal Counseling |
| | | | |
| 03/27/93 | Ill | 2 days | |
| 04/20/93 | Ill | 2 days | |
| 05/01/93 | Ill | 1 day | |
| 06/12/93 | Ill | 4 days | |
| 06/27/93 | Ill | 9 days | |
| 07/18/93 | Ill | 2 days | |
| 07/20/93 | | | **Final Notice** |
| 08/15/93 | Ill | 2 days | |
| 09/26/93 | Late | 2 hrs 20 min | |
| 10/04/93 | Ill | 65 days | |
| | | | |
| 01/12/94 | | | Formal Counseling |
| 03/26/94 | Ill | 11 days | |
| 04/22/94 | | | Formal Counseling |
| 06/11/94 | Late | 20 minutes; Left work 2–1/2 hours early | |
| 06/12/94 | Ill | 3 days | |
| 06/28/94 | | | **TERMINATION** |

1. The Notice of Concern "is the first step in the disciplinary process. It advises the employee that previous counseling, if any, has not been successful and corrective action is required."

2. The Warning Notice "[a]lerts the employee that the situation is serious and immediate correction of the problem is required."

3. Upon receipt of the Final Notice, "[t]he employee must decide if he or she is able and willing to take whatever action is necessary to conform to the rules or meet the expectations of the company. Failure to correct the problem or deficiency within the given time frame could lead to separation."

Between 1990 and 1994, Hardin's tardiness and absenteeism resulted in consistent ratings of "unacceptable" for dependability on United performance reviews, except for a "needs improvement" rating in 1992. During the informal and formal counseling sessions, United attempted to impress upon Hardin that dependability was a crucial aspect of her job performance and that, if she did not improve her dependability rating, she would be subject to disciplinary action, including possible termination.

Despite receiving a Final Notice and subsequently undergoing two formal counseling sessions emphasizing that her employment would be jeopardized by further absences, on June 11, 1994, Hardin reported to work twenty minutes late and left work two-and-one-half hours early in order to care for a sick friend. Thereafter, Hardin did not report to work for three days. She returned to work on June 15, 1994 and presented United with a psychiatrist's note that read: "6/11–6/14/94 Ms. Sally Hardin was unable to work due to stress related condition from caring for a[n] incapacitated person."

On June 27, 1994, Hardin's supervisors met with Hardin to discuss her dependability record. At the meeting, Hardin acknowledged that she had "had serious medical problems in the past several years, [but] that because [she] sought medical attention, these problems [were] resolved and behind [her]." Hardin stated that she "enjoy[s] her job and that [she] would be [at work] for the operation from now on." The following day, June 28, 1994, United terminated Hardin's employment due to her "unacceptable dependability and the lack of improvement over time."

Subsequent to her termination, Hardin applied for unemployment insurance benefits. On July 29, 1994, the Unemployment Insurance Division (UID) issued a "Notice of Unemployment Insurance Decision," disqualifying Hardin for benefits because she had been "discharged for misconduct connected with work." Specifically, the notice stated:

> You were employed by United Airlines Inc[.] as a reservationist from June 3, 1968 to June 28, 1994. You were discharged due to excessive absences and tardiness. The employer reports that you reported for work tardy and you left early on June 11, 1994. Then you were absent on June 12, 13, and 14, 1994. You returned to work on June 15, 1994 with a doctor's note. You indicate that you were absent because you were caring for an ill friend who refused to get medical attention. You were previously warned about your absences and tardiness.
>
> Since you were aware that your job was in jeopardy due to your absences, your actions are considered to be in wilful disregard of the employer's best interests. You therefore were discharged for misconduct connected with work.

Thereafter, Hardin appealed the UID's decision to the DLIR's Security Appeals Office (SAO). In its September 7, 1994 decision, the SAO agreed with the UID that Hardin was disqualified for unemployment benefits, not, however, because Hardin had been discharged for misconduct, but rather because Hardin had voluntarily quit without good cause. The SAO explained:

> Having been provided ample notice that termination was a clearly foreseeable consequence of her action, claimant [ (Hardin) ] effectively abandoned her employment. She was the moving party, and termination must be considered as a quit.
>
> . . . .
>
> As the moving party in the termination of the employment relationship, claimant assumes the burden of establishing, by a preponderance of the evidence, that real, substantial or compelling reason existed for leaving work. Moreover, it is expected that reasonable alternatives be pursued before terminating employment.
>
> It need not be considered whether [Hardin's] friend's health, safety or morals

would have been jeopardized had claimant not left her work to care for him, since she failed to notify the friend's sister, who would be presumed the person most responsible for his care, until after she had assumed that responsibility. Nor did she avail herself of professional sources of emergency care. Thereafter, she extended her absence without attempting to transfer the responsibility to other professional or personal sources, before it effected [sic] her own health and extended her absence.

It need not be doubted that this situation resulted in stress, or that it was of a degree as to preclude her working, yet she personally reached the decision this was the case, and also personally decided when she was able to return. Her psychiatrist, undoubtedly in good faith, simply affirmed these decisions. She confirmed that the condition resulted from claimant's voluntary actions.

Having failed to pursue the reasonable alternatives which would have permitted her to retain her employment, it may not be found that claimant had compelling reason to abandon her work [under] the circumstances that existed at the time she did so.

On October 7, 1994, Hardin appealed the SAO decision to the circuit court.

Following a hearing held on May 1, 1995, the circuit court issued the following Decision and Order on May 12, 1995:

> The appeals officer ruled that [Hardin] voluntarily quit her employment with United Airlines, finding that [Hardin] had abandoned her employment as a reservations sales agent as a result of her four day absence from work between June 11–15, 1994. An employee abandons employment if the employee leaves employment without the intent of returning to work. This court finds that the appeals officer reached an erroneous conclusion of law based on the facts in the record on appeal.

> [Hardin] informed [United] of her leaving her place of employment on June 11, 1994. She gave [United] a reason for leav-

ing and returned to her employment within four days of leaving. [Hardin] worked for approximately two weeks after she returned to work before [United] terminated her employment.

> [United]'s termination of [Hardin] was based on her lack of dependability and not for any misconduct as a result of the incident that occurred between June 11 and June 15, 1994. [United] cited as the reason for [Hardin]'s termination: (1) excessive absences due to illness; (2) infrequent tardiness; and (3) the absence of June 11–15, 1994. A reasonable trier of fact can only infer from the record that [United]'s reason for the termination was not due to misconduct, but due to unsatisfactory performance, i.e., lack of dependability on the part of the employee.

> There are only two incidents in the record which can form the basis of misconduct: (1) tardiness; and (2) unexcused absence. [United] did not rely on tardiness for the basis of the termination which [it] deemed to be infrequent. Nor did [United] rely on the June 11–15, 1994 absence. [United] relied on a totality of circumstances based on [Hardin]'s excessive absences due to illness. Therefore, the moving party in the termination of [Hardin]'s employment was the [e]mployer and not the employee. The court therefore reverses the appeals officer's decision and it is hereby ordered that [Hardin] is entitled to unemployment insurance benefits to the extent that she is otherwise eligible.

This timely appeal followed.

## II. STANDARD OF REVIEW

Review of a decision made by the circuit court upon its review of an agency's decision is a secondary appeal. The standard of review is one in which this court

> must determine whether the circuit court was right or wrong in its decision, applying the standards set forth in [Hawai'i Revised Statutes (]HRS[) ] § 91–14(g) to the agency's decision. This

court's review is further qualified by the principle that the agency's decision carries a presumption of validity and [the party seeking to reverse the agency's decision] has the heavy burden of making a convincing showing that the decision is invalid because it is unjust and unreasonable in its consequences.

HRS § 91–14(g) (19[93]) provides:

Upon review of the record the court may affirm the decision of the agency or remand the case with instructions for further proceedings; or it may reverse or modify the decision and order if the substantial rights of the petitioners may have been prejudiced because the administrative findings, conclusions, decisions, or orders are:

(1) In violation of constitutional or statutory provisions; or

(2) In excess of the statutory authority or jurisdiction of this [sic] agency; or

(3) Made upon unlawful procedure; or

(4) Affected by other error of law; or

(5) Clearly erroneous in view of the reliable, probative, and substantial evidence on the whole record; or

(6) Arbitrary, or capricious, or characterized by abuse of discretion or clearly unwarranted exercise of discretion.

HRS § 91–14(g) (19[93]).

Under HRS § 91–14(g), conclusions of law are reviewable under subsections (1), (2), and (4); questions regarding procedural defects under subsection (3); findings of fact under subsection (5); and an agency's exercise of discretion under subsection (6). Accordingly, a reviewing court will reverse an agency's finding of fact if it concludes that such agency finding is clearly erroneous in view of the reliable, probative, and substantial evidence on the whole record. HRS § 91–14(g)(5). On the other hand, the agency's conclusions of law are freely reviewable.

*University of Hawai'i Professional Assembly v. Tomasu,* 79 Hawai'i 154, 157, 900 P.2d 161, 164 (1995) (quoting *Sussel v. Civil Serv. Comm'n,* 74 Haw. 599, 608–610, 851 P.2d 311, 316–17, *reconsideration denied,* 74 Haw. 650, 857 P.2d 600 (1993)) (original internal brackets omitted).

## III. *DISCUSSION*

On appeal, United contends that Hardin is disqualified for unemployment insurance benefits because: (1) Hardin provoked her discharge, thus compelling the conclusion that she, in effect, voluntarily quit her employment; and (2) assuming Hardin did not quit but, rather, was discharged, she was discharged for misconduct connected with work, that is, for excessive absences.

Under Hawai'i's unemployment compensation statute, HRS Chapter 383, "an individual is eligible to receive employment benefits unless disqualified for any one of six (6) grounds set forth in HRS § 383–30." *Dole Hawai'i Division–Castle & Cooke, Inc. v. Ramil,* 71 Haw. 419, 424–25, 794 P.2d 1115, 1118 (1990). HRS § 383–30 (1993) provides in pertinent part:

**Disqualification for benefits.** An individual shall be disqualified for benefits:

(1) Voluntary separation.... For any week beginning on and after October 1, 1989, in which the individual has left the individual's work voluntarily without good cause....

....

(2) Discharge or suspension for misconduct.... For any week beginning on and after October 1, 1989, in which the individual has been discharged for misconduct connected with work....

"Where disqualification is claimed, the employer has the burden of proving the requisite facts to bring the employee within the statutory deprivation of benefits." *National Tire of Hawai'i v. Kauffman,* 58 Haw. 265, 272, 567 P.2d 1233, 1238 (1977) (citation omitted).

The disqualification analysis, however, depends on whether the employee volun-

tarily left his or her employment or was discharged. "Once the separation has been termed a voluntary leaving on the basis of circumstances surrounding the departure, the 'good cause' exception must be explored. In the case of voluntary quitting, the employee has the burden of establishing that his [or her] leaving was with good cause." *Ipsen v. Akiba,* 80 Hawai'i 481, 488, 911 P.2d 116, 123 (App.1996) (quoting *Noor v. Agsalud,* 2 Haw. App. 560, 563–64, 634 P.2d 1058, 1060 (1981)) (emphasis omitted) (brackets in original). On the other hand, where the facts indicate that the employee was discharged, the employer must demonstrate that the employee was discharged for misconduct connected with work in order to disqualify the employee for unemployment insurance benefits. Thus, the threshold question in the present case is whether Hardin voluntarily left her employment or was discharged.

### A. *Voluntary Separation Versus Discharge*

The Administrative Rules of the Unemployment Insurance Division of the DLIR regarding voluntary separation and suspension or discharge for misconduct provide in relevant part:

§ 12–5–47 *Voluntary separation.* (a) An individual shall be disqualified for benefits for voluntarily leaving work without good cause. (b) *A separation is a voluntary leaving or quitting when the facts and circumstances demonstrate that a claimant is the "moving party" in the termination of an employment relationship.*

§ 12–5–51 *Suspension or discharge for misconduct.* (a) *A discharge occurs when an employer is the "moving party" in the termination of the employment relationship.*

(Emphases added.)

As previously stated, the SAO found that claimant "effectively abandoned her employ-

ment" and that, as the moving party, her "termination must be considered as a quit." The circuit court, however, observed that Hardin "informed [United] of her leaving her place of employment early on June 11, 1994[,] ... gave [United] a reason for leaving and returned to her employment within four days of leaving[,]" and worked for approximately two weeks before receiving United's termination letter. The circuit court, therefore, disagreed with the SAO, finding instead that "the moving party in the termination of [Hardin's] employment was [United] and not [Hardin]."

In urging reversal of the circuit court's determination that Hardin is entitled to unemployment insurance benefits, United urges adoption of the constructive quit/provoked discharge doctrine. Under the constructive quit/provoked discharge doctrine, "where an employee voluntarily engages in conduct which transgresses a legitimate known obligation and leaves the employer no choice but to discharge him [or her]," *Claim of Bookhard,* 131 A.D.2d 912, 516 N.Y.S.2d 363, 364 (1987), the employee shall be considered to have voluntarily abandoned his or her employment. *Id.*

### 1. The constructive quit/provoked discharge doctrine is not implicated in this case.

In *James v. Levine,* 34 N.Y.2d 491, 358 N.Y.S.2d 411, 315 N.E.2d 471 (1974), one of the cases relied upon by United, the New York Court of Appeals explained that the doctrine of provoked discharge was adopted by New York courts to fill what was perceived to be a gap in New York's unemployment insurance disqualification statute: [4]

[T]he doctrine of provoked discharge, had its origin not in the [unemployment insurance] statute, but in *Matter of Malaspina (Carsi),* 309 N.Y. 413, 131 N.E.2d 709 [ (1956),] and the special kind of discharge

---

4. New York's unemployment insurance law renders an employee ineligible to receive unemployment insurance benefits if the employee leaves his or her employment voluntarily or if the em-

ployee is discharged for misconduct in connection with his or her employment. *Id.* 358 N.Y.S.2d at 412, 315 N.E.2d at 472.

there involved. An employee was discharged by his employer because the employee had refused to join the union in an agency shop under a collective bargaining agreement. The act of the employee in refusing to join the union was therefore voluntary. The act of the employer was compelled by its obligation under the collective bargaining agreement. It was held that under such circumstances the employee, who had known of the requirement before employment and being fully aware of the inevitable consequences of his refusal, had voluntarily left his employment by provoking his discharge. Arguably, this was a legitimate and essential gloss on the statute to fill a gap. It did not purport to, nor might it, create a third and distinct category for determining temporary ineligibility for unemployment insurance benefits.

*Id.* 358 N.Y.S.2d at 412–13, 315 N.E.2d at 472–73.

In *James,* each of three claimants was denied unemployment insurance benefits "on the purported ground that each had provoked her discharge [5] and had therefore terminated her employment voluntarily." *Id.* 358 N.Y.S.2d at 412, 315 N.E.2d at 472. Although the *James* court held that it was error for the doctrine of provoked discharge to have been applied to each of the claims for unemployment insurance benefits, the court ultimately held that each claimant was properly disqualified for unemployment insurance benefits on the ground that each had been discharged for misconduct in connection with their employment.

In holding that the doctrine of provoked discharge was erroneously applied, the *James* court criticized the extension of the doctrine "beyond the situation where the employee's voluntary acts result in the employer's 'involuntary' discharge of the employee." *Id.* 358 N.Y.S.2d at 413, 315 N.E.2d at 473. The court explained:

Among other jurisdictions, there has always been disagreement whether one who effects his [or her] own discharge by indirection may be deemed to abandon his [or her] employment "voluntarily". *The doctrine is a fiction in most cases, the real cause of discharge being misconduct.* Some jurisdictions refuse to recognize the category of "constructive voluntary leaving"[.] It would seem that the doctrine arose largely within the context of union activities and collective bargaining agreements, where special policy considerations were at work. . . . *For the large majority of cases, consideration of eligibility under the rubric of misconduct leads to more sensible analysis and resolution.* More important, the statute requires it.

*Id.* 358 N.Y.S.2d at 414, 315 N.E.2d at 473–74 (citations omitted) (emphases added). The court held that, "where the employer may or may not choose to discharge the unsatisfactory employee," application of the doctrine of provoked discharge is inappropriate. *Id.* 358 N.Y.S.2d at 416, 315 N.E.2d at 475. "[M]isconduct," the court explained, "could always 'provoke discharge' but that is not what the doctrine covers." *Id.* 358 N.Y.S.2d at 415, 315 N.E.2d at 474–75. In other words, the

---

**5.** In *James,* claimant James repeatedly reported for work under the influence of alcohol and was told by her employer that, if she continued to report to work in that condition she would be discharged. "On her last day of employment she reported for work under the influence of alcohol, and was discharged at the end of the working day." *Id.* 358 N.Y.S.2d at 414, 315 N.E.2d at 474.

After suffering injuries in a motorcycle accident, claimant Guerrasio's sister informed Guerrasio's employer that she would be unable to work for one week. Guerrasio, however, did not talk to her employer until three weeks after the accident. Guerrasio's father subsequently telephoned her employer just before summer, stating

that Guerrasio would like to return to work after the summer. *Id.*

Claimant Morrison, a social case worker in a mental health clinic, was also denied unemployment insurance benefits on the ground that she had provoked her discharge. In her case, when a superior asked Morrison to explain the disposition in a particular case, she "did not give a satisfactory explanation." *Id.* Accordingly, "[s]he was called to the director's office where the superior was also present. Sensing the confrontation, she left the director's office, although first warned by the director that her leaving would be considered an act of insubordination." *Id.* Morrison was subsequently discharged.

doctrine of provoked discharge should not be applied to cases where the employer retains discretion to discharge the employee but, instead, "should be confined to the instance of the 'involuntary' discharge by an employer for cause flowing from the 'voluntary' act or acts of the employee." *Id.* 358 N.Y.S.2d at 416, 315 N.E.2d at 475.

In the present case, United does not contend that Hardin's behavior compelled it to "involuntarily" dismiss her; rather, it appears that United retained the discretion to terminate Hardin or, as it had done for the several years prior to her termination, continue to work with Hardin to improve her dependability. Consequently, under the circumstances of this case, and assuming, without deciding, its general applicability in this jurisdiction, the doctrine of provoked discharge is not implicated.

## 2. The Intermediate Court of Appeals has addressed and rejected the concept of constructive discharge.

In *Ipsen*, the Intermediate Court of Appeals (ICA) rejected the concept of constructive discharge—a concept similar to the doctrine of provoked discharge. In that case, Jody Ipsen submitted a resignation letter to her employer, complaining that her supervisor had treated her in an "abusive, insulting, and impetuous" manner. 80 Hawai'i at 484, 911 P.2d at 119. Specifically, Ipsen complained that her supervisor had doubted the sincerity of an ankle injury, which had caused her to miss over two weeks of work. After resigning, Ipsen applied for unemployment benefits. The claims examiner denied Ipsen unemployment benefits, determining that Ipsen "voluntarily terminated her employment for personal reasons and without good cause[.]" *Id.* at 485, 911 P.2d at 120. The claims examiner's decision was subsequently affirmed by both the appeals officer and the circuit court.

On appeal, the ICA preliminarily addressed whether Ipsen voluntarily quit her employment or was discharged. Ipsen argued that, notwithstanding the fact that she

resigned from her employment, her employer was the "moving party" in the termination of the employment relationship because her supervisor's actions were "coercive to the point of compelling an involuntary resignation from her." *Id.* at 486, 911 P.2d at 121. The ICA rejected Ipsen's argument, explaining:

[T]he question of whether a leaving was voluntary or involuntary may often overlap with facts related to whether there was "good cause" to leave. Thus, a leaving may be determined to be "involuntary," based on facts also establishing "good cause" to leave. We are aware of cases employing the concept of "constructive discharge," but whether a person has been constructively discharged also rests on the determination of dual issues of voluntariness and "cause." Hence, *the concept of a "constructive discharge" is not necessarily helpful in isolating the issue of whether an employee's leaving was voluntary.*

We believe it more fruitful from an analytical perspective and in light of HAR § 12–5–47(b) ..., to evaluate the issues of voluntariness and "good cause" separately. Consequently, we agree generally with the following statement:

The notion of voluntary quitting without good cause involves two levels of volition: (1) the immediate circumstances of leaving must reflect a subjective intent of the employee to terminate; and (2) the act of leaving must be an exercise of free will and not the product of other compelling reasons or pressures forcing him [or her] to leave. It is the second level of volition that concerns the ultimate issue of whether or not the employee has quit for good cause.

... Thus, in determining whether [Ipsen] "voluntarily" quit, we are concerned with whether the circumstances reflect an intent on the part of the employee to terminate employment. On the other hand, the question of whether there were compelling reasons which forced an employee to leave is properly analyzed under the "good cause" prong of the statutory standard.

This approach is consistent with HAR § 12–5–47(b) which was adopted to implement the statute. HAR § 12–5–47(b) states that an employment separation is considered "a voluntary leaving when the facts and circumstances demonstrate that a claimant is the 'moving party' in the termination of an employment relationship." Voluntary separation is to be contrasted with a "discharge." Under HAR § 12–5–51(a), "[a] discharge occurs when [conversely] an employer is the 'moving party' in the termination of the employment relationship." "Moving" is the present participle of the verb "move." The definitions of "move" include "to change position or posture, to take action." *Webster's Collegiate Dictionary* 761 (10th ed. 1993). The word "move" from which "moving" is derived "is very general and implies no more than the fact of changing position." *Id.*

*Id.* (citations and footnotes omitted) (some brackets in original) (some brackets and emphasis added). Although Ipsen's decision to quit was motivated in part by what she believed to be harassment by her supervisor, the ICA noted that other factors contributed to Ipsen's decision to quit, *e.g.*, the impending sale of the company, which caused Ipsen anxiety regarding her job security, and her ankle injury. Ultimately, the ICA determined that the circuit court's finding that Ipsen was the moving party in the termination of the employment relationship was not clearly erroneous, *id.* at 487, 911 P.2d at 122, and that Ipsen had not satisfied her burden of demonstrating that she left her employment for "good cause." *Id.* at 489–90, 911 P.2d at 124–25.

■ We agree with the ICA that "whether a person has been constructively discharged . . . rests on the determination of dual issues of voluntariness and 'cause'." *Id.* at 486, 911 P.2d at 121. We thus adopt the straightforward analysis applied by the ICA in *Ipsen.*

3. **The circuit court's finding that Hardin did not quit her employment is not clearly erroneous.**

■ Under the administrative scheme adopted by the DLIR, the reasons underlying an employer's decision to discharge an employee are properly considered in making the determination whether the employee was discharged for misconduct. In the present case, the record definitively establishes that United was the moving party in the termination of the employment relationship. After leaving work early in order to care for an ill friend on June 11, 1994, Hardin herself became ill. Once she recovered from her illness—which was excused by a doctor in accordance with her employer's policy—Hardin returned to work on June 15, 1994. Thereafter, Hardin continued to work until June 28, 1994, when she received United's letter notifying her that her employment had been terminated. We therefore hold that the circuit court's finding that Hardin did not quit her employment but, rather, was discharged, is not clearly erroneous.

B. *The circuit court erred in finding that Hardin was not discharged for misconduct connected with work.*

■ United argues that, even if Hardin cannot be considered to have voluntarily left her employment, Hardin is nevertheless disqualified for unemployment insurance benefits because Hardin was "discharged for misconduct connected with work."

In *Camara v. Agsalud,* 67 Haw. 212, 685 P.2d 794 (1984), we stated:

HRS § 383–30(2) disqualifies an individual, otherwise eligible for benefits, if the individual is discharged for misconduct connected with his [or her] work. Administrative Rules § 12–5–51(c), adopted to implement HRS § 383–30(2), defines misconduct:

Misconduct connected with work consists of *actions which show a wilful or wanton disregard of the employer's interests,* such as deliberate violations of or deliberate disregard of the standards of behavior which the employer has a right to expect of an employee, or carelessness, or negligence of such a degree or recurrence as to show wrongful intent or evil design. Mere inefficiency, unsat-

isfactory conduct, poor performance because of inability or incapacity, isolated instances of ordinary negligence or inadvertence, or good-faith errors in judgment or discretion are not misconduct. The misconduct shall be related to the work of the individual or the individual's status as an employee.

67 Haw. at 217–18, 685 P.2d at 798 (footnote omitted) (emphasis added).

HAR § 12–5–51 provides in pertinent part:

(d) In determining whether an individual's act constituted "misconduct" the department shall consider any relevant evidence presented which relates to:

(1) Employee's reasons for the act or omission, and efforts to avoid the act or failure to act;

(2) The relevant circumstances of the case and any causative effect therefrom upon the employee's actions;

(3) The nature and importance to the employer of the offended interest of the employer;

(4) Any lawful and reasonable company policy or custom;

(5) Employer's actions to curtail or prevent, if possible, the objectionable conduct; and

(6) The nature of the act or failure to act.

(e) Situations where misconduct may be found include, but are not limited to, the following where the evidence demonstrates:

(1) *Unexcused absence or recurring unexcused tardiness;* or

(2) Altercation at work; or

(3) Material false representations by the employee to the employer; or

(4) Employee's gross neglect of duty; or

(5) Employee's wilful disobedience of employer's directives or employee's insubordination; or

(6) Intentional conversion of employer's property by the employee; or

(7) Employee's unauthorized use of intoxicants on the job; or

(8) Employee's wilful and substantial abuse of the employer's equipment or property.

(Emphasis added).

In its termination letter to Hardin, United explained that Hardin was discharged due to her "unacceptable dependability and the lack of improvement over time." United's Performance Review Guidelines specify the following elements of dependability:

* Attendance

Regular attendance is a basic requirement for all United employees. Frequency and/or duration of absences may have a negative impact on productivity, sales, and daily operations. The "ideal" goal is a perfect record. Even though that goal isn't always attainable, keeping that goal in mind is generally the best approach.

* Punctuality

Punctuality encompasses each employee's responsibility to be on time for work, meetings, training sessions, and other assignments.

. . . .

In all cases, the requirement for effective performance is to report to work as scheduled and be prepared to begin work at the appointed time.

United's termination letter demonstrates that Hardin's lack of dependability was attributable to *both* her excessive absences and her recurring tardiness. However, the circuit court found that "[t]he Employer did not rely on tardiness for the basis of the termination which the Employer deemed to be infrequent." On appeal, United does not challenge this finding as clearly erroneous. Accordingly, we limit our inquiry to a determination of whether Hardin's absenteeism, viewed alone, constitutes misconduct sufficient to justify denial of unemployment insurance benefits.

There is no question that Hardin had an excessive number of absences. Under cer-

tain circumstances, absenteeism can rise to the level of misconduct and disqualify a claimant for unemployment insurance benefits. *See* HAR § 12–5–51(e). Thus, where an employer urges absenteeism as misconduct, the controlling question is whether the employee's actions "show a wilful or wanton disregard of the employer's interests." HAR § 12–5–51(c); *see Tuff v. Knitcraft Corp.,* 520 N.W.2d 483, 486 (Minn.Ct.App.1994) ("[W]hether there is a single absence or an excessive number of absences, there must also be evidence of a lack of concern by the employee sufficient to constitute [conduct evincing a wilful or wanton disregard of an employer's interests]."), *rev'd on other grounds,* 526 N.W.2d 50 (Minn.1995).

### 1. Hardin's absences due to illness prior to June 11, 1994

As previously stated, during the five years preceding her termination, United consistently rated Hardin's dependability as "unacceptable" based on her tardiness and excessive absences. United concedes, however, that every absence prior to June 11, 1994 was due to a medical condition and that each medical condition was properly documented by a physician's note.[6] United does not contest the legitimacy of any of Hardin's illness-related absences. The argument that Hardin's absences due to illness prior to June 11, 1994 demonstrate a wilful or wanton disregard of United's interests is, therefore, untenable. Consequently, although Hardin's absences due to illness prior to June 11, 1994 may be considered in evaluating her actions on and after that date, they do not themselves reflect any misconduct.

### 2. Hardin's absence from June 11–14, 1994

In reaching its decision that Hardin was discharged based on a "totality of circumstances based on [Hardin's] excessive ab-

sences due to illness[,]" the circuit court specifically found that "[United's] termination of [Hardin] was based on her lack of dependability and not for any misconduct as a result of the incident that occurred between June 11 and June 15, 1994."

As previously stated, the record indicates that on June 11, 1994, Hardin left work two-and-one-half hours early in order to care for a sick friend residing in her home. Without requesting or receiving express permission, Hardin informed her supervisor that she was leaving work and later called to indicate she would not be returning that day.

Thereafter, Hardin was absent from work for three days because she herself purportedly became ill as a result of the stress she suffered caring for her sick friend. When Hardin returned to work on June 15, 1994, she presented a note from her psychiatrist verifying her stress-related illness.

United contends that Hardin's "stress-related" illness "was simply not credible":

> [K]nowing that further absences could not be tolerated she left the job to care for a sick friend whom she hardly knew, to whom she owed no legal duty, who had a sister who could have managed to get help for him, and in addition to all of that refused medical help. In addition, Appellee Hardin could have taken or attempted other alternatives such as trading shifts with another employee which she had done in the past. Appellee Hardin's excuse that she was distraught over a person whom she hardly knew was simply too far fetched to be believable. Rather than calling her doctor as soon as possible she waited two days after leaving work[ ] to report of her illness and in the same call told the doctor that she had to return to work and requested a medical excuse.... The account given by Appellee Hardin was simply not credible....

---

**6.** On cross-examination, Jana Olney, one of Hardin's supervisors, testified as follows:

> [Hardin's counsel]: [Y]ou've testified that Miss Hardin has had a number of illnesses ... during the course of her employment.... [W]ere any of the illnesses unexcused?

> MS. OLNEY: No, she did bring in medical documentation.
> [Hardin's counsel]: She provided the proper notification that United required?
> MS. OLNEY: Right.

We acknowledge that the legitimacy of Hardin's illness may be somewhat suspect insofar as Hardin testified that: (1) she never visited her psychiatrist for the June 12 through 14 absence; (2) the psychiatrist's evaluation of her condition was done over the telephone; and (3) she, not her psychiatrist, made the decision that she would return to work on June 15, 1994. However, we also note that Hardin's supervisor testified before both the SAO and the circuit court that United never challenges the legitimacy of an employee's medical excuse when verified by a doctor's note. Indeed, United never challenged the legitimacy of Hardin's June 12 through 14 stress-related illness claim. Consequently, as with Hardin's previous properly-verified absences due to illness, the suggestion that her June 12 through 14 absence due to stress-related illness demonstrated a wilful or wanton disregard of United's interests is untenable.

■ However, Hardin was not ill when she made the volitional decision to leave work early on June 11 to care for her sick friend. United contends that in the context of Hardin's employment history, Hardin's decision to leave work early on June 11, 1994 constituted a wilful or wanton disregard of United's interests. As stated previously, the UID agreed, finding that, "[s]ince you [ (Hardin) ] were aware that your job was in jeopardy due to your absences, your actions are considered to be in wilful disregard of the employer's best interests. You were therefore discharged for misconduct connected with work."[7] Implicit in the UID's finding was that Hardin's unilateral decision to leave work early on June 11 for personal reasons constituted an "unexcused absence" pursuant to HAR § 12–5–51(e).

In *Thurber v. Hillier & Wanless, P.A.,* 642 So.2d 75 (Fla.Dist.Ct.App.1994), a Flori-

da court denied unemployment insurance benefits to an employee with a history of attendance problems who, like Hardin, was discharged for leaving work early on one occasion without explicit authorization to attend to personal matters:

> An employee has a responsibility to report for work as scheduled, without allowing personal circumstances to interfere with the conditions of employment. Considering the counseling so close to the time of discharge ... the claimant's early departure [at noon] without authorization amount[s] to a breach of her duties and obligations to the employer and demonstrated a disregard for the employer's interests. Under the circumstances, it must be concluded that the claimant was discharged for misconduct within the meaning of the unemployment compensation law.[8]

*Id.* at 76 (emphasis added).

Similarly, in *Fritzo v. Commonwealth Unemployment Compensation Board of Review,* 59 Pa.Cmwlth. 268, 429 A.2d 1215 (1981), a Pennsylvania court found willful misconduct based on a scenario analogous to the instant case:

> The claimant was a regular employee who fully comprehended her obligation to report for work on a given date. She testified her usual practice was to "ask" the floor lady's permission to be absent. In this instance, the claimant deviated from that practice; the record discloses that, rather than requesting permission to be absent, she unilaterally proclaimed her intention to take a vacation the week of August 20, 1979. *The claimant never received either the explicit or implicit permission of her employer to be absent.* The floor lady said nothing a reasonable person could construe as permission to be absent.

---

**7.** Although the SAO also took issue with Hardin's decision to leave work early on June 11, 1994, it determined that Hardin "effectively abandoned her employment" and that, as the moving party, "termination must be considered as a quit." Having found that Hardin "quit," the SAO did not reach the issue of·misconduct, and, although the SAO believed that Hardin's actions of leaving work early constituted disqualifying conduct, its finding that Hardin did not have "good cause" to leave is not equivalent to a finding of misconduct.

**8.** Florida Statutes Annotated § 443.036(26) defines misconduct as "[c]onduct evincing ... wilful or wanton disregard of an employer's interest[,]" similar to HAR § 12–5–51(c).

*Id.* 429 A.2d at 1219 (emphasis added). The *Fritzo* court relied on the fact that "the claimant never requested the employer's permission to be absent from work" and therefore wilfully disregarded the employer's interest in upholding the unemployment compensation board's denial of unemployment insurance benefits due to wilful misconduct related to work.[9] *Id.* at 1217; *see also Grispino v. Commonwealth Unemployment Compensation Bd. of Review,* 81 Pa. Cmwlth. 51, 472 A.2d 288 (1984) (holding that single incident of leaving work early without receiving permission from supervisor to address problem of impending termination of electrical service to his home by employee on probation due to poor attendance record constituted willful misconduct related to work justifying denial of unemployment insurance benefits); *Dulgerian v. Commonwealth Unemployment Compensation Bd. of Review,* 64 Pa.Cmwlth. 342, 439 A.2d 1342 (1982) (holding that single incident of failing to return to work after doctor's visit without permission due to employee's professed anxiety after being informed she may have skin cancer constituted willful misconduct related to work justifying denial of unemployment insurance benefits).

Several other jurisdictions have also held that a single incident of absenteeism can constitute willful misconduct justifying denial of unemployment benefits. *Tuff,* 520 N.W.2d at 486 ("[e]ven a single unexcused absence may constitute misconduct[10]" (citing *Del Dee Foods, Inc. v. Miller,* 390 N.W.2d 415, 418 (Minn.Ct.App.1986)); *Blau v. Masters Restaurant Assocs., Inc.,* 345 N.W.2d 791, 794 (Minn.Ct.App.1984)); *Gunderson v. Libbey Glass,* 412 So.2d 656, 658–59 (La.Ct.App. 1982) ("Absence from work without sufficient reason, particularly in the face of warnings by the employer, may amount to willful misconduct[11] so as to preclude an employee discharged therefor from obtaining unemployment benefits."); *DiGeronimo v. Ross,* 53 A.D.2d 797, 385 N.Y.S.2d 172, 173 (1976) (holding that "leaving work early without permission, after having been previously warned, constitutes misconduct").

We agree with the UID that Hardin, after numerous counseling sessions and notices from United regarding her poor dependability, knew or should have known that her job would be in jeopardy if she chose to leave work early without permission on June 11, 1994. Accordingly, we hold that Hardin's conscious decision to leave work early on June 11 in the face of this risk constituted an unexcused absence which demonstrated a "wilful or wanton disregard of the employer's interests[,]" HAR § 12–5–51(c), thereby disqualifying Hardin for unemployment insurance benefits. Consequently, we also hold that the circuit court's finding that Hardin was not discharged for misconduct connected with work was clearly erroneous.

## C. *Hardin's Request for Attorneys' Fees and Costs*

In light of our holding and instruction that judgment be entered in favor of United, Hardin's assertion that the trial court erred in refusing to award her attorneys' fees and costs is moot.

## IV. CONCLUSION

Pursuant to the foregoing analysis, we vacate the judgment of the circuit court and remand for entry of judgment in favor of United.

---

**9.** Identical to HAR § 12–5–51(c), Pennsylvania courts define misconduct as, *inter alia,* "the wanton and wilful disregard of the employer's interest[.]" *Fritzo,* 429 A.2d at 1218 (citing *Kentucky Fried Chicken of Altoona, Inc. v. Unemployment Compensation Bd. of Review,* 10 Pa.Cmwlth. 90, 309 A.2d 165, 168–69 (1973)).

**10.** Minnesota courts also parallel HAR § 12–5–51(c) in defining misconduct as, *inter alia,* "conduct evincing ... wilful or wanton disregard of an employer's interests[.]" *Tuff,* 520 N.W.2d at 486 (citing *Tilseth v. Midwest Lumber Co.,* 295 Minn. 372, 204 N.W.2d 644, 646 (1973) (citation omitted)).

**11.** Louisiana jurisprudence defines misconduct as "an act of willful or wanton disregard of the employer's interest[.]" *Gunderson,* 412 So.2d at 658 (citations omitted), in line with HAR § 12–5–51(c).