118 P.3d 1201

Susan C. MEDEIROS, Appellant–Appellant,

v.

HAWAI'I DEPARTMENT OF LABOR AND INDUSTRIAL RELATIONS, Unemployment Insurance Division; Employment Security Appeals Referee's Office; Castle Resorts & Hotels; Hilo Hawaiian Hotel, Appellees–Appellees.

No. 24318.

Supreme Court of Hawai'i.

Sept. 1, 2005.

Robert J. Crudele, Hilo, Brian J. De Lima, Howard H. Shiroma, and David H. Lawton, on the briefs, for appellant-appellant Susan C. Medeiros.

Li–Ann Yamashiro, Deputy Attorney General, on the briefs, for appellee-appellee Di-

rector of Labor and Industrial Relations, State of Hawai'i.

NAKAYAMA, ACOBA, and DUFFY, JJ.; and LEVINSON, J., Dissenting, with whom MOON, C.J., Joins.

## Opinion of the Court by DUFFY, J.

Appellant-appellant Susan C. Medeiros appeals from the May 4, 2001 final judgment of the Circuit Court of the Third Circuit, the Honorable Riki May Amano presiding, alleging that the circuit court erred in entering the May 4, 2001 order affirming Decision No. 0001888 of the Employment Security Appeals Referees' Office (ESARO) for the following reasons: (1) "the third circuit court committed error in affirming the decision of the Appeals Officer because the findings of the Appeals Officer are inconsistent with the conclusion that [Medeiros] was terminated for misconduct connected with work as set forth in [Hawai'i Administrative Rule (HAR)] § 12–5–51 [(1981)]";[1] and (2) "the third circuit court committed error by addressing the Appeals Officer's factual finding, although those findings had not been challenged, and the issue before the [circuit] court was whether the findings of the Appeals Officer supported the [ESARO's] conclusion." (Emphasis in original.)

On appeal, Medeiros argues: (1) that she "is entitled to unemployment compensation because the findings of the Appeals Officer are inconsistent with [a] wilful or wanton disregard of the [appellees-appellees Castle Resorts' & Hotels' and Hilo Hawaiian Hotel's [collectively hereinafter, "the Employer"]] interest"; and (2) that "the third circuit court's [May 4, 2001] order affirming [the ESARO's] decision [No.] 0001888 [hereinafter, 'the May 4, 2001 order'], final judgment, [May 4, 2001] notice of entry of judgment[,] and order" are erroneous "because they fail to address the inconsistency of the Appeals Officer's findings with the Appeals Officer's conclusion."

The appellee-appellee Director of the Department of Labor and Industrial Relations' (DLIR), State of Hawai'i [collectively hereinafter, "the Director"] counters that, "under the employment insurance laws," Medeiros's "conduct of placing her hands all the way around her co-worker's neck and throat and shaking her co-worker for five seconds because she was angry at her co-worker for causing a work schedule change[ ] was misconduct" and asserts that this court should

---

1. HAR § 12–5–51 provides as follows:

**Suspension or discharge for misconduct.** (a) A discharge occurs when an employer is the "moving party" in the termination of the employment relationship.

(b) A suspension occurs when the employer takes action to refuse work and remuneration to an employee without terminating the employment relationship.

(c) Misconduct connected with work consists of actions which show a wilful or wanton disregard of the employer's interests, such as deliberate violations of or deliberate disregard of the standards of behavior which the employer has a right to expect of an employee, or carelessness, or negligence of such a degree or recurrence as to show wrongful intent or evil design. Mere inefficiency, unsatisfactory conduct, poor performance because of inability or incapacity, isolated instances of ordinary negligence or inadvertence, or good-faith errors in judgment or discretion are not misconduct. The misconduct shall be related to the work of the individual or the individual's status as an employee.

(d) In determining whether an individual's act constituted "misconduct" the department shall consider any relevant evidence presented which relates to:

(1) Employee's reasons for the act or omission, and efforts to avoid the act or failure to act;

(2) The relevant circumstances of the case and any causative effect therefrom upon the employee's actions;

(3) The nature and importance to the employer of the offended interest of the employer;

(4) Any lawful and reasonable company policy or custom;

(5) Employer's actions to curtail or prevent, if possible, the objectionable conduct; and

(6) The nature of the act or failure to act.

(e) Situations where misconduct may be found include, but are not limited to, the following where the evidence demonstrates:

(1) Unexcused absence or recurring unexcused tardiness; or

(2) Altercation at work; or

(3) Material false representations by the employee to the employer; or

(4) Employee's gross neglect of duty; or

(5) Employee's wilful disobedience of employer's directives or employee's insubordination; or

(6) Intentional conversion of employer's property by the employee; or

(7) Employee's unauthorized use of intoxicants on the job; or

(8) Employee's wilful and substantial abuse of the employer's equipment or property.

affirm the May 4, 2001 final judgment of the circuit court "that ... Medeiros was disqualified for unemployment insurance benefits because she was discharged for misconduct connected with work."

Medeiros replies: (1) "that the Appeals Officer was incorrect" in affirming the Director's decision denying Medeiros unemployment benefits because the Appeals Officer (a) "either employed the hotel's 'zero tolerance policy,' which flies in the face of the legislative intent calling for liberal construction of Hawai'i's unemployment compensation statute" or (b) "the Appeals Officer ... inconsistently concluded on one hand that Appellant's actions lacked wrongful intent but on the other hand concluded they were wilful and wanton"; (2) that the Director's argument on appeal "mis-characterize[s] the unchallenged findings [of the Appeals Officer] and ... [would have] this Appellate Court ... rely on findings which do not exist"; (3) that, "based on the findings of the Appeals Officer in this case, those cases relied upon by the Director which represent intentional acts or life threatening acts can not be factually relevant to the issue at hand"; and (4) that Medeiros "has met her burden of making a convincing showing that the decision is invalid because ... it[ is] unjust and unreasonable [in its] consequences." (Internal quotation signals and citations omitted.)

For the reasons discussed below in section III, we affirm the circuit court's (1) May 4, 2001 order affirming ESARO's Decision No. 0001888, and (2) May 4, 2001 final judgment.

## I. BACKGROUND

The following unchallenged statement of procedural history and factual background is set forth in Decision No. 0001888:

The claimant [ (i.e., Medeiros) ] worked as a hostess for the Employer from November 1978 until she was suspended on July 30, 2000 for placing her hands around the neck of a co-worker. She was discharged effective August 9, 2000.

The claimant's co-worker was dissatisfied with a policy of the Employer related to work scheduling. The co-worker complained about the policy to the food and beverage director and thereafter the policy was changed. As a result of the policy change, many employees' schedules changed, including that of the claimant. On the morning of July 30, 2000, when the schedules changed, the claimant came up behind the co-worker in the bus station of the restaurant, put her hands around the co-worker's neck and throat and shook her lightly for about five seconds, and said[,] "It's all because of you." The claimant then voluntarily removed her hands from the [co-worker's] throat. The co-worker was shocked because she had not seen the claimant approaching her, and she was offended because she did not think she should be touched in that manner. She was not, however, actually afraid of being hurt by the claimant. The claimant and the co-worker had known each other for nine years and[ ] prior to this incident were on good terms and joked around with one another.

This incident was witnessed by another co-worker, who did not perceive the claimant's actions as either violent or threatening[ ] and who was of the opinion that the co-worker whose throat was grabbed "took it the wrong way." After the incident, the three of them sat together and talked and laughed for a few minutes. Although she participated in the conversation, the co-worker who had been grabbed by the throat continued to be upset but did not say anything because she did not want to make [a] scene. She also did not want to disrupt the work schedule so she did not report the matter until her work schedule ended at about 9 or 9:30 a.m. Then she reported the matter to the food and beverage director. She also related the matter to the human resources manager and the general manager.

These three managers then met and discussed the matter in light of the company's "zero tolerance for violence" policy. The company policy, which had been distributed to employees, including the claimant, in 1998, provides:

"[Employer] has zero tolerance for violence in the workplace. Violence is defined to include but is not limited to: physically harming another, shoving, pushing, harassment, verbal or physical intimidation, coercion, brandishing weap-

ons, and/or threats or talk of violence. Workplace is defined to include but is not limited to: being on Company premises, Company time or Company business. No talk of violence, including joking about violence, will be tolerated."[2]

The managers discussed this policy and the manner it should be applied[ ] and determined that the claimant should be suspended pending an investigation. The food and beverage director prepared a corrective action suspending the claimant, called her into his office on July 31, 2000, read it to her[,] and then gave her an opportunity to make any written comments she wished. [The claimant] wrote that she had put her hands around her co-worker's neck, but that she wasn't punched in for work at the time and that she and her two co-workers were "laughing and playing" thereafter.[3]

The co-worker was then asked to make a written statement about the incident. She provided the statement on July 31, 2000. Her statement said, among other things:

"I was quite in shock as well as very upset that this event had just occurred. My reaction consisted of swallowing the words and the neck grabbing, continuing on with my job duties."

"To me, anytime someone places two hands or even one hand on another person's neck/throat area, the sole intent of that aggressive behavior is definitely to choke or even hang that person up. If she was so upset with the new changes and had a problem, I feel she should have taken the time to talk personally with you and our supervisors regarding her concerns."

". . . I strongly felt yesterday was [a] great example of how actions speak louder than words.[ ]"

The information about the incident, including this statement[,] was sent to the corporate office in Honolulu because the

2. The company policy continues in relevant part:

Any employee who believes that the actions or words of a co-worker, or third-party, constitute intimidation, harassment, or a threat of violence should report it as soon as possible to the General Manager and the Corporate Human Resources department. All complaints of intimidation, harassment, or threats of violence will be investigated promptly and will be kept confidential to the extent possible. Any employee who is found to have engaged in any intimidation, harassment, or threat of violence to another employee will be subject to termination.

On August 15, 1998, Medeiros signed and dated a form entitled "Castle Resorts & Hotels Acknowledgment of Employee Handbook," which provides in relevant part:

I acknowledge receipt of the Employee handbook and agree to read all policies and rules contained herein. I understand that violation of any rule and/or policy may result in corrective action up to [and] including termination.

I acknowledge that employment is on an at-will basis and that I or Castle Resorts & Hotels may terminate employment at any time, with or without notice, with or without cause.

I understand that the policies described herein are not conditions of employment and this Handbook is not intended to create or imply a contract between myself and Castle Resorts & Hotels. In consideration of employment, and continued employment, I agree to abide with the policies, procedures, rules and regulations of Castle Resorts & Hotels.

3. The "corrective action," dated July 30, 2000, described the incident as follows:

On 7/30/00 a complaint of physical assault has been filed against you. It has been stated that upon entering your work area, you came from behind another employee, put your hands around her neck, [shook her] with a slight back and forth movement and accused her of being responsible for a change of schedule which was implemented in the Queen's Court restaurant. This is in violation of company policy located on page 37 of your handbook. It states under the Violence–Free Workplace section: ["]**Castle Resorts & Hotels has zero tolerance for violence in the workplace. Violence is defined to include but not [be] limited to: physicall[y] harming another, shoving, pushing, harassment, verbal or physical intimidation, [and] coercion[."]** It also states on page 38, ["]**Any employee who is found to have engaged in any intimidation, harassment, or threat of violence to another employee will be subjected to termination.[**"]

(Emphasis in original.)

Medeiros hand-wrote the following comments on the "corrective action" form, in a space "provided to the employee to agree or disagree and state reason(s) why": "When I walked in on [the complainant and the witness,] they were complaining about the schedule. I did put my hands around [the complainant's] neck and said, [']because of this the schedule was changed[,'] but we were laughing and playing in the station before we all started to work. And *wasn't* punched in at that time." (Emphasis in original.)

managers on the Big Island were not empowered to discharge employees. On August 08, 2000, the corporate office advised the general manager there were "no exceptions" to the "zero tolerance" policy and that the claimant should be discharged.

The claimant had worked for the Employer for 22 years and had never before been involved in such an incident. Although she had received a copy of the "zero tolerance" policy two years earlier, she did not remember it.

As noted above, Medeiros was suspended on July 30, 2000. On August 2, 2000, Medeiros filed a "common application form" for "determination of insured status" and/or "work registration" with the Director's Unemployment Insurance Division (UID). On August 14, 2000, the UID mailed two notices of unemployment insurance decisions, which effectively ruled that Medeiros was disqualified from receiving any unemployment insurance benefits. The first notice of decision explained as follows:

You were employed with the Hilo Hawaiian Hotel as a hostess from November 1978. On July 30, 2000, you were suspended until August 8, 2000, for physically assaulting another employee. On July 30, 2000, you placed your hands around the neck of another employee, and insinuated that a change[ ] in the work schedule was due to this employee. Although you intended the incident as joking around, the other employee felt offended and assaulted, and reported the incident to the Employer. The company has a zero tolerance policy regarding violence in the workplace, of which you were issued a copy at hire.

You[r] physical assault on another employee[ ] constitutes a wilful and deliberate disregard of the Employer's and the other employee's interest. As such, you were suspended for misconduct connected with work.

The second notice of decision essentially provided the same explanation as the first.

On August 15, 2000, Medeiros filed an "application for reconsideration or notice of appeal" with the UID.

On September 28, 2000, an ESARO Appeals Officer conducted a hearing regarding Case No. 0001888, Medeiros's appeal from the UID's two August 14, 2000 unemployment insurance decisions. Medeiros testified, *inter alia*, that "[she] was not joking about violence ... [but] was just joking with her[ co-worker.]" The Appeals Officer also heard testimony that Medeiros was a senior line employee in the highest pay grade ("Hostess I"), while the co-worker was a part-time bus person.

As recited above, on September 29, 2000, the Appeals Officer issued Decision No. 0001888, which, *inter alia*, cited HAR § 12–5–51, *see supra* note 1, and ruled as follows:

*REASONS FOR DECISION:*

. . . .

The relevant issue in this case is whether the claimant (*i.e.*, Medeiros) was discharged for misconduct connected with work.

Misconduct connected with work consists of actions which show a wilful or wanton disregard of the employer's interests, such as deliberate violations of or deliberate disregard of the standards of behavior which the employer has a right to expect of an employee. [*See* HAR § 12–5–51(c).] On the other hand, isolated instances of ordinary negligence or inadvertence, or good faith errors in judgment or discretion are not misconduct. [*See id.*] The burden of proof is on the employer to show that the claimant was discharged for misconduct.

In this case, the claimant's attorney argues that the claimant was discharged for an isolated instance of poor judgment, and the claimant testified she believes she was not "joking about violence," but was only "joking." Clearly, this was an isolated instance. Nothing like it had happened in the claimant's 22 years of prior employment. In addition, it clearly constituted poor judgment. While the claimant did not intend to actually threaten or harm her co-worker, she touched her co-worker in a clearly offensive manner and without her permission.

However, when the claimant testified she was not "joking about violence," but was only "joking," she demonstrated a lack of forthrightness. In this case, when the claimant approached her co-worker from

behind, placed her hands around the claimant's neck and throat and shook her, however lightly, her actions clearly constituted a "joke about violence." Jokes about violence were prohibited by the Employer's zero tolerance policy. Although the policy refers to "talk" about violence, including "jokes about violence," this should not be interpreted as excluding physical jokes about violence. Jokes need not be verbal, they can consist of physical actions. As the offended co-worker stated, sometimes "actions speak louder than words." This is one of those times.

With or without a "zero tolerance policy" against violence, employers have the right to expect that their employees will refrain from treating co-workers in a manner that can shock and upset them. The claimant in this case breached that duty. Furthermore, she did so wilfully. Although she did not intend to harm or threaten the co-worker, she did not p[ut h]er hands around her co-worker's neck and throat inadvertently or accidentally, but intentionally. Under these circumstances, it is concluded the claimant did commit acts which showed a deliberate disregard of standards of behavior which the Employer had a right to expect of her. It is therefore concluded the claimant was discharged for misconduct connected with . . . work.

*DECISION:*

The determinations of the [UID] are affirmed. The claimant is disqualified for benefits . . . on the basis that she was discharged for misconduct connected with . . . work.

On October 27, 2000, Medeiros filed a notice of appeal to the circuit court, requesting judicial review of Decision No. 0001888, pursuant to HRS § 91–14 (1993), Hawai'i Rules of Civil Procedure (HRCP) Rule 72 (2000), and HAR § 12–5–51.

On December 22, 2000, Medeiros filed her opening brief in the circuit court, arguing as follows: (1) that "the [UID] did not correctly apply HAR § 12–5–51 when it found that . . . Medeiros's isolated instance of poor judgment, not intended to actually harm or threaten, rose to the level of misconduct connected with work"; (2) that "the DLIR incorrectly used the Employer's 'zero tolerance' for violence policy to determine if [Medei-

ros's] conduct rose to the level of misconduct connected with work as defined by HAR § 12–5–51"; (3) that "the DLIR's conclusion that [Medeiros's] actions rose to the level of misconduct connected with work is clearly erroneous in view of the testimony and HAR § 12–5–51," inasmuch as (a) "Medeiros did not violate the 'violence-free workplace' policy" and (b) "Medeiros['s] actions did not rise to the level of misconduct according to the standards of HAR § 12–5–51(c)"; and (3) that "the decision of the DLIR is unjust and unreasonable under the circumstances and consequences of this case."

On February 5, 2001, the Director filed an answering brief in the circuit court, contending that "the Appeals Officer's credibility determination that [Medeiros] was joking about violence when she placed her hands around a co-worker's neck should not be disturbed, and therefore, the Appeals Officer's decision that [Medeiros] violated [the] Employer's zero tolerance policy against violence is not clearly erroneous." On February 8, 2001, the Employer filed an acknowledgment of service of, and joinder in, the Director's answering brief.

On February 14, 2001, Medeiros filed a reply to the Director's answering brief, asserting, *inter alia,* as follows: (1) that "*Cam[a]ra v. Agsalud,* 67 Haw. 212, 685 P.2d 794 (1984)[,] is the controlling case as it provides that it is not the action of the claimant which is at issue but it is the intent of the claimant," such that, "[w]here the claimant's intent does not rise to the level of wilful or wanton disregard of the employer's interest[,] the act itself does not allow for a denial of unemployment benefits"; (2) that she "reaffirms [her] position that . . . [the] DLIR's reliance on the [E]mployer's 'zero tolerance for violence policy' is an improper narrowing of the unemployment security law which is to be liberally construed in order to achieve the beneficent legislative purpose of relief of workers under the stress of unemployment through no fault of their own"; (3) that "[t]he threat of violence was neither intended nor perceived and therefore the 'zero tolerance to violence policy' does not apply"; (4) that "the Appeals Officer's decision is clearly erroneous because it is incon-

sistent with a determination that ... Medeiros acted in a manner inconsistent with her employer's interests"; (5) that "[t]he decision is unjust and unreasonable because ... Medeiros was suspended and terminated after 22 years of employment without so much as her employer investigating the circumstances of this incident"; (6) that "the DLIR's reliance on [the Employer's 'automatic suspension/zero tolerance/no case-by-case decision'] policy in determining whether ... Medeiros was entitled to unemployment insurance compensation is wholly unfair and leaves the determination of unemployment benefits in the hands of the employer." (Some internal quotation signals and citations omitted.) Medeiros also stated that she would not submit a reply to the Employer's joinder in the Director's answering brief.

On March 16, 2001, the circuit court conducted a hearing regarding Medeiros's appeal, entertaining arguments from counsel for Medeiros, the Director, and the Employer. Following the parties' arguments, the circuit court orally ruled as follows:

THE COURT: I agree with the appellees. I think that not just one matter that we look at or one dimension that we look at and certainly that's not what the hearings officer or appeals officer looks at. [The Appeals Officer] looks at all the circumstances, and she did make a finding that it was not ... Medeiros's intention to scare someone or intention to choke someone.... But that in the context of all that was occurring that the act constituted [a] sufficient basis for [a] finding of misconduct under the unemployment law and, therefore, precluded the recovery by the appellant for the same benefits.

I also agree that the record as it currently stands ... sufficiently supports the finding of ... the appeals officer. And ... I have looked at it carefully. I read the transcript. I try to read the transcript because I know how important it is. Given that, I look for errors, procedural and ... factual[ ] mistakes. There are none in this record.

So I am going to accord the appeals officer[ ] due deference and going to deny or rather affirm the appeals officer's decision.

You understand, of course, [Medeiros's Counsel,] that there is another remedy and that is further appeal.

[Medeiros's Counsel:] Yes, Your Honor.

THE COURT: And I think we've made a record today of my reasons.

On May 4, 2001, the circuit court entered an order affirming Decision No. 0001888, ruling in relevant part as follows:

The Appeals Officer considered all the facts of this case in reaching the decision that ... Medeiros was discharged for misconduct connected with work. The Appeals Officer's decision is supported by the reliable, probative, and substantial evidence in the record and the [circuit] court is satisfied that ... Decision [No.] 0001888 is not clearly erroneous.

Based on the foregoing, ... Decision [No.] 0001888 dated September 29, 2000, is affirmed and the appeal of ... Medeiros is denied.

That same date, the circuit court entered final judgment in favor of the Director and the Employer and against Medeiros.

On May 30, 2001, Medeiros timely filed a notice of appeal.

## II. *STANDARD OF REVIEW*

### A. *Secondary Appeal*

■ Review of a decision made by the circuit court upon its review of an agency's decision is a secondary appeal. The standard of review is one in which this court must determine whether the circuit court was right or wrong in its decision, applying the standards set forth in HRS § 91–14(g) [ (1993) ] to the agency's decision.

HRS § 91–14, entitled "Judicial review of contested cases," provides in relevant part:

(g) Upon review of the record the court may affirm the decision of the agency or remand the case with instructions for further proceedings; or it may reverse or modify the decision and order if the substantial rights of the petitioners may have been prejudiced because the administrative findings, conclusions, decisions, or orders are:

(1) In violation of constitutional or statutory provisions; or

(2) In excess of the statutory authority or jurisdiction of the agency; or

(3) Made upon unlawful procedure; or

(4) Affected by other error of law; or

(5) Clearly erroneous in view of the reliable, probative, and substantial evidence on the whole record; or

(6) Arbitrary, or capricious, or characterized by abuse of discretion or clearly unwarranted exercise of discretion.

[U]nder HRS § 91–14(g), conclusions of law are reviewable under subsections (1), (2) and (4); questions regarding procedural defects under subsection (3); findings of fact under subsection (5); and an agency's exercise of discretion under subsection (6).

*Lingle v. Hawaii Government Employees Ass'n, AFSCME, Local 152, AFL–CIO,* 107 Hawai'i 178, 183, 111 P.3d 587, 592 (2005) (quoting *Paul's Elec. Serv., Inc. v. Befitel,* 104 Hawai'i 412, 416, 91 P.3d 494, 498 (2004) (citations and some quotation signals omitted) (brackets in original)).

## B. *Construction of Administrative Rules*

■ The general principles of construction which apply to statutes also apply to administrative rules. As in statutory construction, courts look first at an administrative rule's language. If an administrative rule's language is unambiguous, and its literal application is neither inconsistent with the policies of the statute the rule implements nor produces an absurd or unjust result, courts enforce the rule's plain meaning.

*International Bhd. of Elec. Workers, Local 1357 v. Hawaiian Tel. Co.,* 68 Haw. 316, 323, 713 P.2d 943, 950 (1986) (citations omitted).

*Allstate Ins. Co. v. Ponce,* 105 Hawai'i 445, 454, 99 P.3d 96, 105 (2004) (quoting *In re Doe Children: John, Born on January 27, 1987, and Jane, Born on July 31, 1988,* 105 Hawai'i 38, 53, 93 P.3d 1145, 1160 (2004) (quoting *In re Wai'ola O Moloka'i, Inc.,* 103 Hawai'i 401, 425, 83 P.3d 664, 688 (2004) (quoting *Lee v. Elbaum,* 77 Hawai'i 446, 457, 887 P.2d 656, 667 (App.1993)))).

## III. *DISCUSSION*

Medeiros contends in her opening brief that (1) in light of the Appeals Officer's findings of fact (FOFs) in Decision No. 0001888, the Appeals Officer wrongly concluded that Medeiros "did commit acts which showed a deliberate disregard of standards of behavior which the Employer had a right to expect of her," such that Medeiros "was discharged for misconduct connected with ... work," and (2) the circuit court erred in entering its order affirming Decision No. 0001888 and the accompanying final judgment because of the foregoing inconsistency between the Appeals Officer's FOFs and conclusion of law (COL). We disagree.

### A. *"Disqualification for Benefits" under HRS § 383–30*

The clear and unambiguous language of HRS § 383–30 (1993) states that an individual is disqualified from receiving benefits under Hawai'i unemployment security law when the employee is discharged for misconduct connected with work. Specifically, section 383–30 provides:

> **Disqualification for benefits.** An individual shall be disqualified for benefits:
>
> . . . .
>
> (2) Discharge or suspension for misconduct. For any week prior to October 1, 1989, in which the individual has been discharged for *misconduct connected with work,* and continuing until the individual has, subsequent to the week in which the discharge occurred, been employed for at least five consecutive weeks of employment. For the week in which the individual has been suspended for misconduct connected with work and for not less than one or more than four consecutive weeks of unemployment which immediately follow such week, as determined in each case in accordance with the seriousness of the misconduct. For the purposes of this paragraph, "weeks of employment" means all those weeks within each of which the individual has performed services in employment for not less than two days or four hours

per week, for one or more employers, whether or not such employers are subject to this chapter. For any week beginning on and after October 1, 1989, in which the individual has been discharged for misconduct connected with work, and until the individual has, subsequent to the week in which the discharge occurred, been paid wages in covered employment equal to not less than five times the individual's weekly benefit amount as determined under section 383–22(b).

(Emphasis added.) The statute's lack of ambiguity is both confirmed and explained by a review of its statutory history within the context of Hawai'i unemployment security law. As set forth below, this history shows that the intent of the unemployment benefits provisions is to pay benefits only to those claimants who became involuntarily unemployed *through no fault of their own.*

### 1. HRS § 383–30(2) Prior to 1976

Prior to 1976, HRS § 383–30(2)[4] allowed individuals discharged for misconduct to receive unemployment benefits after waiting out a minimum disqualification period of three weeks, and which allowed those suspended for misconduct to receive benefits without any disqualification period.[5]

### 2. The 1976 Amendment to HRS § 383–30(2)

In 1976, Section 383–30(2) was amended by Act 157 of the Session Laws of Hawai'i of 1976 to provide that an individual be disqualified for benefits:

For the week in which he [or she] has been discharged or suspended for misconduct connected with his [or her] work, and continuing until he [or she] has, subsequent to the week in which the discharge or suspension occurred, been employed for at least five consecutive weeks of employment. For the purposes of this subsection, "weeks of employment" means all those weeks within each of which he [or she] has performed services in employment for not less than two days or four hours per week, for one or more employers, whether or not such employers are subject to this chapter.

1976 Haw. Sess. L. Act 157, § 2 at 293. The effect of the 1976 amendment to HRS § 383–30 was to narrow the scope of unemployment benefits coverage by expanding the minimum disqualification period for receiving unemployment benefits to five weeks when an individual was discharged or suspended for misconduct connected with work.

Act 157 arose out of Senate Bill (SB) 2326–76, entitled "A Bill for an Act Relating to Employment Security." In explaining the purposes of SB 2326, the Senate Human Resources Committee stated as follows:

The purpose of this bill is to make several amendments to the Unemployment Compensation Law to ensure that benefits are paid only to those claimants who are *involuntarily unemployed through no fault of their own,* to provide the means to detect and prevent fraudulent claims, and to provide adequate financing of the Unemployment Insurance Trust Fund to restore its solvency.

The specific proposals are:

. . . .

2. To amend the provisions for disqualification due to voluntary separation from employment without good cause (Section 383–30(1)), discharge or suspension for misconduct (Section 383–30(2)), and failure without good cause to apply for or accept suitable work (Section 383–30(3)) in order to require an individual to requalify for benefits by becoming employed for a minimum of five consecutive weeks subsequent to the disqualification, and then being sep-

4. The pre–1976 HRS § 383–30(2) provided that an individual was disqualified for benefits:

For the week in which he has been discharged for misconduct connected with his work and for not less than two or more than seven consecutive weeks of unemployment which immediately follow such week, as determined in each case in accordance with the seriousness of the misconduct.

HRS § 383–30(2) (1968).

5. In 1973, this court held that the words "discharged for misconduct" as then provided for by HRS 383–30(2) did not include suspension for misconduct. *Matson Terminals, Inc. v. Hasegawa,* 54 Haw. 563, 566, 512 P.2d 1, 3 (1973).

arated from such subsequent employment under non-disqualifying conditions. Under the present law, an individual disqualified for any of the aforementioned reasons may not draw benefits for three to eight weeks; however, after serving his [or her] disqualification period, the individual may then draw his [or her] full benefit entitlement, if he [or she] is otherwise eligible to do so. *The intent of the law is to pay benefits to workers who are involuntarily unemployed. Under the proposed amendment, an individual who caused his [or her] own unemployment would not draw benefits until he [or she] has amply demonstrated his [or her] attachment to the labor force by working subsequent to his [or her] voluntary unemployment.*

Sen. Stand. Comm. Rep. No. 352–76, in 1976 Senate Journal, at 1037–38 (emphases added). The House Labor and Public Employment Committee similarly noted that the disqualification provisions for misconduct and voluntary separation were being amended to require "unemployment insurance claimants to work five consecutive weeks in order to requalify for benefits if they voluntarily quit their jobs without good cause, *were suspended or fired for misconduct* or failed to apply for suitable work" in order to "correct weaknesses in benefit provisions." Hse. Stand. Comm. Rep. No. 776–76, in 1976 House Journal, at 1647 (emphasis added). The report added:

> [B]ecause the State's unemployment program was established to mitigate the effects of sudden or extended unemployment on the involuntarily unemployed, *eligibility for benefits should not be automatic for the worker who by his actions, creates his own unemployment.*

*Id.* at 1648 (emphasis added).

The statutory history of HRS § 383–30(2) is thus consistent with the plain language of the statute: individuals discharged for misconduct connected with work are disqualified from receiving unemployment benefits, at least until the statutory disqualification period has been satisfied.

### B. *HAR § 12–5–51*

As noted above in note 1, HAR § 12–5–51(c), adopted to define "misconduct connected with work" under HRS § 383–30(2), provides that:

> *Misconduct connected with work* consists of actions which show a *wilful or wanton disregard of the employer's interests,* such as *deliberate violations of or deliberate disregard of the standards of behavior which the employer has a right to expect of an employee,* or carelessness, or negligence of such a degree or recurrence as to show wrongful intent or evil design. Mere inefficiency, unsatisfactory conduct, poor performance because of inability or incapacity, isolated instances of ordinary negligence or inadvertence, or good-faith errors in judgment or discretion are not misconduct. *The misconduct shall be related to the work of the individual or the individual's status as an employee.*

(Emphases added.)

HAR § 12–5–51(d) in turn provides that, in determining whether an individual's act constituted "misconduct" for unemployment insurance purposes, the Director shall consider any relevant evidence presented which relates to:

(1) Employee's reasons for the act or omission, and efforts to avoid the act or failure to act;

(2) The relevant circumstances of the case and any causative effort therefrom upon the employee's actions;

(3) The nature and importance to the employer of the offended interest of the employer;

(4) Any lawful and reasonable company policy or custom;

(5) Employer's actions to curtail or prevent, if possible, the objectionable conduct; and

(6) The nature of the act or failure to act.

### C. *Analysis of HAR § 12–5–51 Factors in Determining Misconduct*

An analysis of the factors listed in HAR § 12–5–51(d) shows that Medeiros's actions constituted "misconduct" for unemployment insurance purposes.

### 1. Employee's reasons for the act or omission, and efforts to avoid the act or failure to act.

The Appeals Officer found that Medeiros's conduct was prompted by a change in her work schedule, which she attributed to her co-worker's complaint to management about work schedules. Medeiros's statement, "It's all because of you," accompanying her physical contact with her co-worker's neck and throat, further shows that Medeiros's reason for acting was that she blamed her co-worker for a change in her work schedule with which she was displeased.

### 2. The related circumstances of the case and any causative effect therefrom upon the employee's actions.

The Appeals Officer found that Medeiros's conduct was related to the change in her work schedule, which became effective on the day of the incident. The Appeals Officer also found that change in work schedules was occasioned by her co-worker's complaint to management.

### 3. The nature and importance to the employer of the offended interest of the employer.

As noted above in note 2, the Employer had a "zero tolerance for violence in the workplace" policy, which policy was distributed to employees, including Medeiros, in 1998. This policy defined "violence" as follows:

> Violence is defined to include but is not limited to: physically harming another, shoving, pushing, harassment, verbal or physical intimidation, coercion, brandishing weapons, and/or threats or talk of violence .... No talk of violence, including joking about violence, will be tolerated.

(Emphases added.) The policy further provided the following warning: "Any employee who is found to have engaged in any intimidation, harassment, or threat of violence to another employee will be subject to termination." (Emphasis added.) The importance of the Employer's "zero tolerance for violence in the workplace" policy cannot be disputed.

### 4. Any lawful and reasonable company policy or custom.

■ It cannot reasonably be disputed that the Employer's "zero tolerance for violence in the workplace" policy is a lawful and reasonable company policy.

### 5. Employer's actions to curtail or protect, if possible, the objectionable conduct.

The Employer's "zero tolerance for violence in the workplace" policy was distributed to all employees, including Medeiros, in 1998, and Medeiros acknowledged receiving it.

### 6. The nature of the act or failure to act.

■ Medeiros, then a full-time, senior restaurant hostess, does not dispute the Appeals Officer's finding that she approached her co-worker, a part-time restaurant bus person, from behind in the workplace, placed her hands around her co-worker's neck and throat, and shook her lightly for approximately five seconds, while saying, "It's all because of you." Medeiros also does not dispute that her above-described actions were intentional with respect to her *conduct* (*i.e.* that she intended to place her hands around the co-worker's neck and throat). Although Medeiros does not dispute her objective conduct, she contends that because she did not subjectively intend to harm or threaten her co-worker as a result of that conduct, she cannot be said to have wilfully or wantonly disregarded her Employer's interest in eliminating violence in the workplace. We disagree because, as set forth in this court's prior decisions and discussed below, the level of culpability required to show wilful or wanton disregard is not subjective intent, but conscious disregard of a known (or which should have been known) risk with respect to a result of the conduct.

■ In summary, an analysis of the HAR § 12–5–51(d) factors shows that Medeiros's actions constituted "misconduct connected with work." We thus agree with the Appeals Officer's conclusion that Medeiros's conduct demonstrated a wilful or wanton disregard

for the standards of behavior which the Employer had a right to expect of Medeiros, and constituted misconduct connected with work. We are not persuaded by the dissent's contention that the Appeals Officer's findings that the incident in question was "an isolated instance" and "constituted poor judgment" necessarily result in Medeiros's conduct falling within instances enumerated in HAR § 12–5–51(c) of what does not constitute misconduct. The portion of this rule which Medeiros refers to as not constituting misconduct is "isolated instances of ordinary negligence or inadvertence, or good faith errors in judgment or discretion," both situations of simple negligence or mistake. The nature of Medeiros's conduct, however, was not negligence; as discussed herein, Medeiros admitted that she intended the physical contact with her co-worker (and does not deny telling the co-worker, "It's all because of you," while placing both of her hands around her co-worker's neck and throat, and lightly shaking her). Therefore, although Medeiros's conduct did represent an isolated incident, it nevertheless fits within the definition of "misconduct connected with work" set forth in HAR § 12–5–51, as the Appeals Officer correctly concluded.

### D. *Relevant Prior Decisions of This Court*

This court has on two previous occasions considered the issue of "misconduct connected with work" under HAR § 12–5–51 as related to disqualification for unemployment benefits pursuant to HRS § 383–30(2). *See Camara v. Agsalud*, 67 Haw. 212, 685 P.2d 794 (1984); *Hardin v. Akiba*, 84 Hawai'i 305, 933 P.2d 1339 (1997). A comparison and contrast of those cases to the instant case, set forth below, also persuades us that Medeiros was properly found to be disqualified from unemployment benefits due to having been discharged for misconduct connected with work.

#### 1. *Camara v. Agsalud*

We respectfully submit that the dissent's reliance upon *Camara v. Agsalud* is mis-

placed, as *Camara* is distinguishable. In *Camara*, the employee was discharged because he was involved in a traffic accident. *Camara*, 67 Haw. 212, 213, 685 P.2d 794, 795. The employee, while trying to pass a slow-moving truck, crossed the center line on the highway near an intersection. *Id.* The employee felt that he could safely pass the truck; his view in front was unobstructed, there was no oncoming traffic, and the center line was about to change from solid to broken. *Id.* at 213–14, 685 P.2d at 795–96. However, a collision ensued when the truck made an unsignaled left turn [6] at the intersection. *Id.* The employee was discharged and subsequently denied unemployment insurance benefits based upon a decision of the Appeals Officer (also known as "referee") for unemployment compensation appeals that the employee "acted in wilful disregard of the Employer's best interest when he proceeded to cross the solid line." *Id.* at 214, 685 P.2d at 796. The circuit court reversed the Appeals Officer's decision, stating that (1) the Appeals Officer's finding that the employee believed that he could safely pass the truck was inconsistent with his (Appeals Officer's) determination that the employee acted in wilful disregard of the Employer's interest, and (2) the employee's single driving error does not demonstrate a wanton disregard of the employer's interests absent other evidence of poor driving or other misconduct connected with work. *Id.* at 214–15, 685 P.2d at 796. Under these facts, we agreed with the circuit court that the Appeals Officer's conclusion was inconsistent with and not supported by the undisputed facts. *Id.* at 217, 685 P.2d at 798. We further stated that the Appeals Officer's decision was not consistent with the beneficent and humane purpose of the unemployment compensation statute to relieve the stress of economic insecurity due to unemployment, and held that the statute should be liberally construed to promote the intended legislative policy. *Id.* at 218, 685 P.2d at 798.

In affirming the circuit court's reversal of the Appeals Officer's decision, we noted that "[a]t best, the Employee's action was an iso-

---

**6.** The truck driver had activated his left turn signal light but he later found out that the signal light was inoperable. *Id.* at 214, 685 P.2d at

796. Also, the Appeals Officer found that the truck was partially at fault for the accident because it was slow-moving. *Id.*

lated instance of negligence or a good-faith error in judgment." *Id.* We then specifically limited our holding to the negligence facts of *Camara* as follows: "We hold that Employee's actions does not approach the degree of negligence or carelessness to show wrongful intent or evil design amounting to misconduct." *Id.* at 219, 685 P.2d at 798. In other words, *Camara* stands only for the proposition that simple negligence does not constitute misconduct sufficient to disqualify an employee for unemployment benefits under HRS § 383–30 and HAR § 12–5–51.

■ The dissent makes much of the beneficent intent and rule of liberal construction cited in *Camara*. While we agree that, as a general matter, the unemployment benefits statute does evince a beneficent intent and should be liberally construed, neither such intent nor liberal construction trumps the clear and unambiguous language of HRS § 383–30(2) that an individual is disqualified from receiving unemployment benefits when the individual is discharged for misconduct connected with work. The Intermediate Court of Appeals spoke to this point in *Keanini v. Akiba*, 93 Hawai'i 75, 86, 996 P.2d 280, 291 (App.2000):

> With respect to the legislative purpose, Claimant cites the general principle that the "Hawai'i Unemployment Security Law should be liberally construed in order to achieve the beneficent legislative purpose of relief of workers under stress of unemployment *through no fault of their own.*" *Berkoff v. Hasegawa*, 55 Haw. 22, 27, 514 P.2d 575, 579 (1973) (internal quotation marks and citation omitted). We agree; however, based upon the foregoing discussion, *Claimant cannot be said to be without fault.*

(Emphases added.) We concur; where a claimant, such as Medeiros, is found to have been discharged for misconduct connected with work, neither the beneficent intent of the unemployment benefits statute nor the

rule of liberal construction, trumps the clear and unambiguous language of HRS 383–30(2) that the individual is disqualified from receiving unemployment benefits.[7]

### 2. *Hardin v. Akiba*

Thirteen years after *Camara*, this court revisited the issue of "misconduct connected with work" in *Hardin v. Akiba*, 84 Hawai'i 305, 933 P.2d 1339 (1997). In *Hardin*, an employee was discharged on the basis of a single unexcused absence after "numerous counseling sessions and notices from [her employer] regarding her poor dependability." *Id.* at 318, 933 P.2d at 1352. When she applied for unemployment benefits, the Director ruled that she was disqualified due to having voluntarily abandoned her position without compelling reason. *Id.* at 309, 933 P.2d at 1343. The circuit court reversed, holding that the employee had in fact been discharged due to unsatisfactory performance and had not voluntarily separated. *Id.* The circuit court also held that because her discharge was not due to misconduct, she was not disqualified from receiving benefits. *Id.*

On appeal, this court vacated the circuit court's decision and directed that judgment be entered in favor of the employer, holding that the employee had been discharged due to misconduct connected with work pursuant to HRS § 383–30(2) and HAR § 12–5–51(c), and was thus disqualified from receiving benefits. *Id.* at 318, 933 P.2d at 1352. The *Hardin* court set forth the basis for its decision as follows:

> We agree with the [Director] that [the employee], after numerous counseling sessions and notices from [the employer] regarding her poor dependability, knew or should have known that her job would be in jeopardy if she chose to leave work early without permission on June 11, 1994. Accordingly, we hold that [the employee's] conscious decision to leave work early on

---

7. While *Camara* is thus distinguishable on its facts, we take this opportunity to reconfirm *Camara's* holdings that (1) a single act of negligence in driving a motor vehicle does not demonstrate a wanton disregard of the employer's interests absent other evidence of poor driving or other misconduct connected with work, and (2) our

unemployment compensation statute should, as a general matter, be liberally construed to promote the intended legislative policy of relieving the stress of economic insecurity due to unemployment which occurs through no fault of the employee.

June 11 in the face of this risk constituted an unexcused absence which demonstrated a "wilful or wanton disregard of the employer's interests[,]" HAR § 12–5–51(c), thereby disqualifying [her] for unemployment insurance benefits. Consequently, we also hold that the circuit court's finding that [she] was not discharged for misconduct connected with work was clearly erroneous.

*Id.*

The *Hardin* facts are different from the instant case in that Hardin had numerous counseling sessions regarding her prior dependability before the final incident of leaving work early without permission which led to her termination and subsequent disqualification from receiving unemployment benefits, while Medeiros had no such history. The facts are similar, however, to the extent that the misconduct involved intentional actions by the employee. Considering the similarity, and the fact that the misconduct by Medeiros (violation of the Employer's "zero tolerance for violence in the workplace" policy) is at least as serious (and presumably more so) as the misconduct in *Hardin* (poor dependability), we believe that it is appropriate to apply the *Hardin* rationale to this case.

Applying the *Hardin* rationale to the facts here, we conclude that Medeiros "knew or should have known that her job would be in jeopardy" if she violated her employer's zero tolerance policy regarding violence in the workplace.[8] Medeiros consciously disregarded that risk when she approached her co-worker from behind, placing her hands around her co-worker's neck, and shaking her while saying, "It's all because of you" (*i.e.* blaming the co-worker for a change in the employees' work schedule), even if Medeiros did not subjectively intend any physical harm and the co-worker did not subjectively perceive any physical threat. In its best light, Medeiros's conduct constituted a "joke about violence," which conduct was in violation of the Employer's zero tolerance for violence in the workplace policy, as found by the Appeals Officer. Consequently, Medeiros's conduct showed a wilful or wanton disregard of her employer's interest in having a violence-free workplace, and was in deliberate disregard of the standards of behavior which the employer had a right to expect of an employee. As such, Medeiros's conduct constituted misconduct connected with work, as found by the Appeals Officer and affirmed by the circuit court. Accordingly, we hold that Medeiros's misconduct connected with work disqualified her from receiving unemployment benefits pursuant to HRS § 383–30(2).

## IV. *CONCLUSION*

Based on the foregoing analysis, we affirm the circuit court's (1) May 4, 2001 order affirming Decision No. 0001888 and (2) May 4, 2001 final judgment.

Dissenting Opinion by LEVINSON, J., in which MOON, C.J., joins.

I respectfully dissent.

The majority opinion fails to adhere to the unambiguous language of Hawai'i Administrative Rules (HAR) § 12–5–51(c), *see* majority opinion at 259 n. 1, 118 P.3d at 1202 n. 1, which implements the "beneficent and humane purpose of relieving the stress of economic insecurity due to unemployment," *Camara v. Agsalud,* 67 Haw. 212, 216–17, 685 P.2d 794, 797 (1984) (citations omitted), underlying Hawaii's employment security law, Hawai'i Revised Statutes (HRS) Chapter 383. *See Allstate Ins. Co. v. Ponce,* 105

---

**8.** We note, however, that an employer may *not*, by way of a policy or otherwise, unilaterally narrow the qualifications for unemployment benefits or redefine a legal term of art such as "misconduct connected with work." *See Gonzales v. Industrial Commission of the State of Colorado,* 740 P.2d 999, 1003 (Colo.1987) ("adoption of such an approach would in effect grant employers ultimate authority to determine that some claimants automatically should not receive unemployment compensation benefits").

To put it plainly, an employer's policy (and evidence of its distribution to the claimant) can be relevant in identifying (1) the existence and nature of an employer's interest under HAR § 12–5–51(c); and (2) an employee's awareness of that interest, but an employee's violation of such policy is not in itself sufficient to justify a finding of misconduct connected with work so as to disqualify a claimant for unemployment compensation benefits.

Hawai'i 445, 454, 99 P.3d 96, 105 (2004) (citations omitted). By neglecting the plain meaning of HAR § 12–5–51(c), the majority has produced an absurd and unjust result. *See Allstate Ins. Co.*, 105 Hawai'i at 454, 99 P.3d at 105 (citations omitted).

For the reasons discussed *infra* in sections I and II, I would hold as follows: (1) that the Employment Security Appeals Referees' Office's (ESARO's) Decision No. 0001888 was erroneous because (a) its undisputed findings of fact do not support its conclusion that the appellant-appellant Susan C. Medeiros acted in wilful or wanton disregard of the appellees-appellees Castle Resorts' & Hotels' and Hilo Hawaiian Hotel's [collectively hereinafter, "the Employer's"] interests, (b) Medeiros's actions, as a matter of law, do not rise to the level of negligence or carelessness required for a conclusion of wrongful intent or evil design amounting to misconduct, and (c) the decision was not consonant with the beneficent and humane purpose of employment security law; and (2) that, for the foregoing reasons, the circuit court erred in affirming the ESARO's Decision No. 0001888. Accordingly, I would (1) reverse the circuit court's (a) May 4, 2001 order affirming the ESARO's Decision No. 0001888 and (b) May 4, 2001 final judgment and (2) remand this matter to the ESARO for entry of a decision in Medeiros's favor.

## I. *STATUTORY AND REGULATORY INTERPRETATION*

A. *HRS § 383–30 Is Clear And Unambiguous And Does Not Provide That Unemployment Benefits Are Limited To Claimants Who Were Terminated Through No Fault Of Their Own.*

"When construing a statute, our foremost obligation is to ascertain and give effect to the intention of the legislature, which is to be obtained primarily from the language contained in the statute itself." *In re Doe Children*, 105 Hawai'i 38, 53, 93 P.3d 1145, 1160 (2004) (internal citations and quotation signals omitted). Moreover, "[i]t is a cardinal rule of statutory interpretation that, where

the terms of a statute are plain, unambiguous and explicit, we are not at liberty to look beyond that language for a different meaning. Instead, our sole duty is to give effect to the statute's plain and obvious meaning." *State v. Walker*, 106 Hawai'i 1, 8, 100 P.3d 595, 602 (2004) (internal citations and quotation signals omitted).

The majority ignores the foregoing principles, noting at the outset of its analysis that the language of HRS § 383–30 (1993), *see* majority opinion at 265, 118 P.3d at 1208, is "clear and unambiguous[,]" *id.*, but nevertheless mistakenly delving into the statute's legislative history in order to glean "the intent of the unemployment benefits provisions [as endeavoring] to pay benefits only to those claimants who became involuntarily unemployed *through no fault of their own.*" Majority opinion at 266, 118 P.3d at 1209 (emphasis in original). The plain and unambiguous language of HRS § 383–30, however, does *not* employ any construct of "fault." *See* majority opinion at 266, 118 P.3d at 1209. Insofar as the majority cites HRS § 383–30(2) in its entirety and observes that the statute is "clear and unambiguous[,]" the majority stumbles in asserting, based on its extraneous review of legislative history, that HRS § 383–30 excludes claimants on the basis of "fault." I further discuss the inapplicability of the majority's construction of "fault" to the present matter *infra* in section II.A.

B. *A Dispositive Application Of HAR § 12–5–51(c) Establishes That Medeiros Did Not Engage In Misconduct.*

In any case, HAR § 12–5–51(c), *see* majority opinion at 259 n. 1, 118 P.3d at 1202 n. 1, the specific regulation implementing HRS § 383–30, *see* majority opinion at 265, 118 P.3d at 1208, is dispositive as to the present matter. HAR § 12–5–51(c) provides that neither "isolated instances of ordinary negligence or inadvertence" nor "good-faith errors in judgment or discretion" rise to the level of "misconduct." The ESARO Appeals Officer entered the following unchallenged findings of fact (FOFs): (1) that the com-

plaintant "was not . . . actually afraid of being hurt by [Medeiros]"; (2) that Medeiros and the complainant "had known each other for nine years and, prior to this incident[,] were on good terms and joked around with one another"; (3) that the co-worker who witnessed the incident "did not perceive [Medeiros's] actions as either violent or threatening[ ] and . . . was of the opinion that the [complainant] . . . 'took it the wrong way' "; (4) that following the incident, Medeiros, the complainant, and the witness "sat together and talked and laughed for a few minutes"; (5) that Medeiros *"had worked for the Employer for 22 years and had never before been involved in such an incident"*; (6) that, because *"[n]othing like [this incident] had happened in [Medeiros's] 22 years of prior employment,"* it *"[c]learly . . . was an isolated instance"*; (7) that Medeiros's conduct *"clearly constituted poor judgment"*; and (8) that Medeiros *"did not intend to actually threaten or harm her co-worker* [.]" (Emphases added.)

The Appeals Officer's FOFs *necessarily* fall within several of the instances enumerated in HAR § 12–5–51(c) of what does *not* constitute misconduct. The FOFs indicate that Medeiros committed a "good-faith error[ ] in judgment," insofar as the Appeals Officer found that Medeiros's conduct "clearly constituted poor judgment" and Medeiros "did not intend to actually threaten or harm her co-worker." Moreover, the Appeals Officer's FOFs track another of HAR § 12–5–51(c)'s illustrations of *non-misconduct*—"isolated instances of ordinary negligence"—the Appeals Officer having expressly found (1) that Medeiros's conduct reflected no more than an "isolated instance" and, (2) that based, *inter alia,* on Medeiros's relationship and level of comfort with the complainant (to wit, that they were nine-year acquaintances who were on "good terms" and "joked around with one another"), Medeiros's expectation that her conduct would not offend her co-worker constituted only "ordinary negligence."

Nevertheless, and despite her FOFs, the Appeals Officer concluded that Medeiros

"was discharged for misconduct connected with . . . work" on the basis that, notwithstanding the fact that Medeiros "did not intend to harm or threaten [her] co-worker," Medeiros's "wilful" breach of her duty to "refrain from treating [her] co-workers in a manner that can shock and upset them" amounted to "a deliberate disregard of standards of behavior which the Employer had a right to expect of her." But insofar as the Appeals Officer found that, in this "isolated instance," Medeiros "did not intend to harm or threaten [her] co-worker" and instead intended *only* to "joke" with her co-worker, who was a nine-year acquaintance with whom Medeiros was on "good terms" and had "joked around with" in the past, Medeiros's conduct, ill-advised as it may have been, could not constitute a "wilful" breach of her duty to "refrain from treating [her] co-workers in a manner that can shock and upset them" and could not rise to the level of "deliberate disregard of standards of behavior which the Employer had a right to expect of her." That being the case, the Appeals Officer's COL that Medeiros "was discharged for misconduct connected with . . . work" was wrong.

It therefore follows that the circuit court erred in affirming Decision No. 0001888. As section I of the majority opinion explains, the circuit court reasoned that the question whether Medeiros had been terminated for misconduct turned on "not just one matter that we look at or one dimension that we look at," but rather on "all [of] the circumstances" and that, "in the context of all that was occurring[,] . . . the act constituted [a] sufficient basis for [a] finding of misconduct under the unemployment law and, therefore, precluded the recovery by [Medeiros] for the same benefits." The circuit court ruled "that the record as it currently stands . . . sufficiently supports the finding of the hearings officer or the appeals officer" and stated that it would "accord the appeals officer[ ] due deference and . . . affirm the appeals officer's decision." But as discussed *supra,* the Appeals Officer's FOFs do not describe HAR § 12–5–51(c)'s characterization of miscon-

duct; to the contrary, they are consonant with the rule's provisions expressly setting out what is *not* misconduct. Because Decision No. 0001888 was erroneous, the circuit court likewise erred in affirming it.

C. *The Majority Erroneously Elevates HAR § 12–5–51(d) Over HAR § 12–5–51(c) And Wrongly Allows The Employer To Narrow Medeiros's Qualification For Unemployment Benefits.*

By contrast to the foregoing, the majority elevates its construction of the factors for considering whether a claimant's actions constitute misconduct, listed in HAR § 12–5–51(d), *see* majority opinion at 267, 118 P.3d at 1210, over the definition of non-misconduct *per se*, as set forth in HAR § 12–5–51(c). The majority also contravenes its own acknowledgment "that an employer may *not*, by way of a policy or otherwise, unilaterally narrow the qualifications for unemployment benefits or redefine a legal term of art such as 'misconduct connected with work.'" Majority opinion at 271 n. 8, 118 P.3d at 1213 n. 8 (citing *Gonzales v. Indus. Comm'n of the State of Colo.*, 740 P.2d 999, 1003 (Colo.1987)) ("adoption of such an approach would in effect grant employers ultimate authority to determine that some claimants automatically should not receive unemployment compensation benefits"). Notwithstanding that the majority emphasizes that "an employee's violation of such policy is not in itself sufficient to justify a finding of misconduct connected with work so as to disqualify a claimant for unemployment compensation benefits[,]" majority opinion at 271 n. 8, 118 P.3d at 1213 n. 8, the majority's reliance upon the Employer's "zero tolerance for violence in the workplace" policy effectively allows the Employer's policy to take precedence over the unambiguous definition of non-misconduct set forth in HAR § 12–5–51(c). *See* majority opinion at 268, 118 P.3d at 1211. Thus, allowing the Employer to unilaterally narrow the qualifications for unemployment benefits and redefine "misconduct connected with work" is *precisely* what the majority accomplishes by reasoning and ruling that "Medeiros's conduct ... was in violation of the Employer's zero tolerance for violence in the workplace policy," and that, "[a]s such, Medeiros's conduct constituted misconduct connected with work[.]" Majority opinion at 271, 118 P.3d at 1213.

D. *The Majority Does Not Effectuate All Of The Relevant Definitions Of Non-Misconduct.*

The majority opinion further suffers from obfuscating the categorical exclusion of certain behavior from the regulatory definition of "misconduct connected with work." The majority characterizes "isolated instances of ordinary negligence or inadvertence, or good faith errors in judgment or discretion," which HAR § 12–5–51(c) unambiguously provides are *not* misconduct, as "situations of simple negligence or mistake." Majority opinion at 268, 118 P.3d at 1211. Notwithstanding that the majority recognizes that a "mistake" is not misconduct, the majority considers only the possibility that Medeiros's behavior constituted "negligence." Majority opinion at 268, 118 P.3d at 1211. The majority ignores HAR § 12–5–51(c)'s provision that a "good-faith error[ ] in judgment" is not misconduct, as well as the ESARO Appeals Officer's unchallenged FOFs that Medeiros's conduct "clearly constituted poor judgment" and that Medeiros "did not intend to actually threaten or harm her co-worker." *See supra* section I.B. The majority therefore turns a blind eye to the definition of non-misconduct, set forth in HAR § 12–5–51(c), which should dictate the outcome of this appeal.

II. *ANALYSIS OF RELEVANT CASE LAW*

A. *Camara v. Agsalud Is Analogous To The Present Matter Insofar As Both Cases Concern Isolated Instances Of Negligence Or Good–Faith Errors In Judgment.*

The majority's claim to the contrary notwithstanding, the correct resolution of the

present matter is governed by this court's decision in *Camara v. Agsalud,* 67 Haw. 212, 685 P.2d 794 (1984).[1] In *Camara,* the employer appealed from the circuit court's decision reversing the decision of the DLIR Appeals Officer "by concluding that [the employee was] qualified to receive unemployment insurance benefits." 67 Haw. at 212, 685 P.2d at 795. The Appeals Officer had found as follows:

> He [ (*i.e.,* Camara) ] was discharged by the Employer because he was involved in a traffic accident on November 5, 1981. On that day, he crossed a solid line on the highway while trying to pass a slow moving pick-up truck. He could have safely passed the pick-up truck except that the truck proceeded to turn left and thus the two vehicles collided.
>
> The Claimant was traveling at approximately 50 miles per hour on a 55 miles per hour highway. The other vehicle was traveling about 30 miles per hour before the left turn was negotiated.
>
> Other than the solid line, the intersection was not "controlled" by signs or other indicators. The road is an open highway which goes through the rural agricultural area. There was no sign to caution the Claimant to reduce his speed.
>
> Just beyond the point of the impact of the accident, the highway has a broken center line.
>
> The driver of the other vehicle had activated his left turn signal light but he later found that the signal light was inoperative.
>
> The Claimant crossed the solid line because he could see that the stretch of highway before him was clear of oncoming traffic. He was not trying to avoid the

accident when he crossed the solid line and he was aware of the solid line.

> . . . .

> The evidence shows that the Claimant crossed a solid line near an intersection. He was aware of the solid line but he felt that he could safely pass the slow moving pick-up truck. Although the other vehicle was partially at fault because it was traveling so slowly, I find that the Claimant had acted in wilful disregard of the Employer's best interest when he proceeded to cross the solid line. Moreover, the evidence fails to show that the Claimant had crossed the solid line because he was trying to avoid an accident.

(Record On Appeal (ROA), 38–40).

Based on the incident, [Camara] was discharged from employment. He subsequently applied for unemployment insurance benefits which were denied by the claims officer. Pursuant to Hawaii Revised Statutes (HRS) § 383–38, Employee filed an appeal with the referee who made findings of facts and concluded that Employee had been discharged for misconduct and therefore, disqualified from receiving benefits.

An appeal was filed with the circuit court pursuant to HRS § 383–41. The circuit court reversed, stating that:

> [T]he hearing officer specifically found that the Appellant felt that he could safely pass the vehicle in front of him. Such a finding is inconsistent with the determination that the Appellant acted in wilful disregard of the employer's interests. Further, the single isolated driving error by Appellant does not demonstrate a wanton disregard of the

---

1. The contention of the appellee-appellee Director of the Department of Labor and Industrial Relations' (DLIR), State of Hawaiʻi [collectively hereinafter, "the Director"] that *Camara* is distinguishable is also unpersuasive. The Director maintains that *Camara* is inapposite to the present matter in light of extrajurisdictional authority that stands for the proposition "that an isolated instance of poor judgment can constitute misconduct," such that "the facts in this case . . . show

that [Medeiros's] isolated instance of poor judgment did indeed rise to the level of misconduct." The Director's reliance upon non-binding jurisprudence is unavailing given the DLIR's controlling administrative rule, to wit, the provision of HAR § 12–5–51(c) that "isolated instances of ordinary negligence or inadvertence, or good-faith errors in judgment or discretion are *not* misconduct." (Emphasis added.)

employer's interests absent other evidence of poor driving or other misconduct connected with work.

(ROA, 180).

*Id.* at 212–15, 685 P.2d at 795–96 (ellipsis points in original) (some brackets added and some in original).

On the employer's appeal to this court, we reasoned and held as follows:

> *The unemployment compensation statute was enacted for the beneficent and humane purpose of relieving the stress of economic insecurity due to unemployment. It should therefore be liberally construed to promote the intended legislative policy.* Berkoff v. Hasegawa, *55 Haw. 22, 27, 514 P.2d 575, 579 (1973);* Bailey's Bakery v. Tax Commissioner, *38 Haw. 16, 28 (1948); 76 Am.Jur.2d,* Unemployment Compensation, *§ 6 (1975); 81 C.J.S.,* Social Security and Public Welfare, *§ 147 (1977). In view of the basic policy of the statute of protecting the worker from the hazard of unemployment, our courts must view with caution any construction which would narrow the coverage of the statute and deprive qualified persons of the benefits thereunder.* Emrick v. Unemployment Compensation Comm'n, *53 Del. 561, 173 A.2d 743, 745 (1961);* Donahue v. Dept. of Employment Security, *142 Vt. 351, 454 A.2d 1244 (1982);* Smith v. Employers' Overload, *314 N.W.2d 220 (Minn.1981); 76 Am.Jur.2d,* supra.
>
> *The referee's findings of fact were not disturbed by the circuit court. We have examined the evidence in [the] record and hold that the findings are not clearly erroneous and therefore, will not be disturbed by this court. As to the referee's conclusion that the Employee is disqualified for benefits due to his discharge for misconduct connected with work, we agree with the circuit court that the conclusion is inconsistent with and not supported by the undisputed facts. Furthermore, the decision of the referee is not consonant with the purpose of the employment security law. We hold that the court was correct in reversing the referee's decision.*

. . . .

HRS § 383–30(2) disqualifies an individual, otherwise eligible for benefits, if the individual is discharged for misconduct connected with his work. [HAR] § 12–5–51(c), adopted to implement HRS § 383–30(2), defines misconduct:

> Misconduct connected with work consists of actions which show a wilful or wanton disregard of the employer's interests, such as deliberate violations of or deliberate disregard of the standards of behavior which the employer has a right to expect of an employee, or carelessness, or negligence of such a degree or recurrence as to show wrongful intent or evil design. Mere inefficiency, unsatisfactory conduct, poor performance because of inability or incapacity, isolated instances of ordinary negligence or inadvertence, or good-faith errors in judgment or discretion are not misconduct. The misconduct shall be related to the work of the individual or the individual's status as an employee.

In tort law, noncompliance with an established statutory standard is not necessarily conclusive on the issue of negligence, *Pickering v. State,* 57 Haw. 405, 408, 557 P.2d 125, 127 (1976), but is merely evidence of negligence, *Michel v. Valdastri, Ltd.,* 59 Haw. 53, 575 P.2d 1299 (1978). Under tort law the Employee driving his vehicle over a solid line to pass another vehicle on a highway would be a violation of the traffic code, but without more, such a passing would not amount to negligence *per se. In view of the beneficent purpose of the law, we refuse to hold that under the Hawaii Employment Security Law that same action is more than mere evidence of negligence. Rule 12–5–51 itself provides that "isolated instances of ordinary negligence or . . . good-faith errors in judgment . . . are not misconduct. . . ."* [Camara], although aware of the solid line and its significance, felt he could safely pass, and would have safely passed had not the pickup truck, without the left signal light flashing, made the left turn. *Aside from the*

*fact that [Camara] violated the traffic code by passing a vehicle on a solid line, there is no evidence of repeated negligence or careless conduct on [Camara's] part . . . . At best, [Camara's] action was an isolated instance of negligence or a good-faith error in judgment.*

*We hold that [Camara's] action does not approach the degree of negligence or carelessness to show wrongful intent or evil design amounting to misconduct. We concur with the circuit court that the facts do not support the conclusion that [Camara] acted in wilful or wanton disregard of the Employer's interests.*

*Id.* at 216–19, 685 P.2d at 797–99 (emphases added).

As in *Camara*, where "the Employee['s] violat[ion of the] traffic code by passing a vehicle on a solid line" was, "[a]t best, . . . an isolated instance of negligence or a good-faith error in judgment[,]" 67 Haw. at 218, 685 P.2d at 798 (emphasis added), Medeiros's isolated instance of poor judgment by joking about violence, although contrary to the Employer's "zero tolerance" policy, likewise fell outside the scope of misconduct delineated in HAR § 12–5–51. Indeed, the Appeals Officer's finding that, because "[n]othing like [the relevant incident] had happened in [Medeiros's] 22 years of prior employment," it "[c]learly . . . was an isolated instance," is strikingly analogous to the majority's approval of *Camara's* holding that "a single act of negligence in driving a motor vehicle does not demonstrate a wanton disregard of the employer's interests absent other evidence of poor driving or other misconduct connect with work[.]" Majority opinion at 270 n. 7, 118 P.3d at 1213 n. 7. Accordingly, as in *Camara*, the ESARO Appeals Officer's "conclusion [that Medeiros was guilty of misconduct connected with work] is inconsistent with and not supported by the undisputed facts." 67 Haw. at 217, 685 P.2d at 798.

I would hold that "the decision of the [Appeals Officer was] not consonant with the ['beneficent and humane'] purpose of the employment security law" and that Medeiros's

actions "do[ ] not approach the degree of negligence or carelessness to show wrongful intent or evil design amounting to misconduct[,] . . . [such that] the facts do not support the conclusion that [Medeiros] acted in wilful or wanton disregard of the Employer's interests." *Id.* at 217–19, 685 P.2d at 798–99. I would therefore further hold that the circuit court erred in affirming Decision No. 0001888.

The majority asserts that *Camara* is distinguishable from the present matter based on the self-evident proposition that "neither [the beneficent] intent [of Hawaii's employment security law] nor liberal construction [of the statute] trumps the clear and unambiguous language of HRS § 383–30(2), [*see* majority opinion at 265, 118 P.3d at 1208,] that an individual is disqualified from receiving unemployment benefits when the individual is discharged for misconduct connected with work." Majority opinion at 270, 118 P.3d at 1213. However, because Medeiros was not discharged for misconduct connected with work as defined by HAR § 12–5–51(c), HRS § 383–30(2) is inapposite to the present matter.

The majority also cites *Keanini v. Akiba,* 93 Hawai'i 75, 86, 996 P.2d 280, 291 (App. 2000), which in turn quotes *Berkoff v. Hasegawa,* 55 Haw. 22, 514 P.2d 575 (1973), for the proposition that the "Hawai'i Unemployment Security Law should be liberally construed in order to achieve the beneficent legislative purpose of relief of workers under the stress of unemployment through no fault of their own." *Berkoff,* 55 Haw. at 27, 514 P.2d at 579 (internal quotation marks and citation omitted). *Keanini* and *Berkoff* notwithstanding, HAR § 12–5–51(c) plainly affords unemployment benefits to claimants who are unemployed through "fault" of their own, inasmuch as the regulation defines *nonmisconduct* as including "inefficiency, unsatisfactory conduct, poor performance because of inability or incapacity, isolated instances of ordinary negligence or inadvertence, [and] good-faith errors in judgment or discretion[.]" An employee who is terminated for engaging in any of the foregoing classes of

behavior can be said to have become unemployed through their own "fault," but HAR § 12–5–51(c) provides that such employees are nonetheless eligible for unemployment benefits. As such, the majority opinion's application of the *Keanini* "fault" principle is contrary to the express provisions of the HAR § 12–5–51(c).

B. *Hardin v. Akiba Is Inapposite To The Present Matter Because The Claimant In Hardin Engaged In Conduct That Was Not An "Isolated Instance."*

The majority similarly misapplies *Hardin v. Akiba*, 84 Hawai'i 305, 933 P.2d 1339 (1997), to the present matter. As the majority notes, the *Hardin* court ultimately "agree[d] with the [employer] that [the claimant], *after numerous counseling sessions and notices from [the employer] regarding her poor dependability, knew or should have known that her job would be in jeopardy if she chose to leave work early without permission on June 11, 1994.*" 84 Hawai'i at 318, 933 P.2d at 1352 (emphasis added). In other words, *Hardin* stated that, precisely because the claimant had been counseled several times and had received multiple notices regarding her offensive behavior, she was on notice, at least constructively, that she could lose her job if she continued to engage in misconduct. Indeed, the claimant had repeated notices and counseling over a two-and-a-half year period regarding her behavior. *Hardin*, 84 Hawai'i at 307, 933 P.2d at 1341. In total, the claimant was counseled eleven times and received three notices, all while she was continually absent and tardy. *Id.* The majority therefore concedes that "[t]he *Hardin* facts are different from the instant case in that *[the claimant] had numerous counseling sessions regarding her prior dependability before the final incident* ... which led to her termination and subsequent disqualification from receiving unemployment benefits, while *Medeiros had no such history.*" Majority opinion at 271, 118 P.3d at 1214 (emphases added). The majority also admits that "Medeiros's conduct did represent an *isolated in-*

*cident* [.]" Majority opinion at 269, 118 P.3d at 1212 (emphasis added).

Notwithstanding the foregoing, the majority "[a]ppl[ies] the *Hardin* rationale to the facts here, ... conclud[ing] that Medeiros 'knew or should have known that her job would be in jeopardy' if she violated her employer's zero tolerance policy regarding violence in the workplace." Majority opinion at 271, 118 P.3d at 1214 (footnote omitted). As discussed *supra*, the *"Hardin* rationale" that the claimant "knew or should have known that her job would be in jeopardy" is grounded in the claimant having had "numerous counseling sessions and notices from [the employer]"—a condition that the majority concedes is *not* met in the instant case. As such, by the majority's own admission, the *"Hardin* rationale" is inapposite to the present matter.

Moreover, although the majority acknowledges that "Medeiros had no ... history" analogous to the claimant in *Hardin*, majority opinion at 271, 118 P.3d at 1214, the majority asserts that, inasmuch as "[t]he facts are similar ... to the extent that the misconduct involved intentional actions by the employee" and "the misconduct by Medeiros ... is at least as serious (and presumably more so) as the misconduct in *Hardin* [,] ... it is appropriate to apply the *Hardin* rationale to this case." Majority opinion at 271, 118 P.3d at 1214. But the *"Hardin* rationale" upon which the majority relies did *not* turn on whether the claimant's act was intentional or the degree of "seriousness" of the misconduct, but rather was conditioned on the fact that the claimant's misconduct did not represent an "isolated instance." 84 Hawai'i at 318, 933 P.2d at 1352.

The fact of the matter is that the claimants in *Camara, Hardin,* and the present case *all* engaged in intentional acts of varying degrees of "seriousness." The conduct at issue in *Camara*—intentionally violating the traffic code and passing a vehicle across a solid line—is "serious" misconduct because it entailed a substantial risk of injury or death both to the claimant and to other drivers. It

is reasonable to assume that such misconduct is "at least as serious (and presumably more so) as the misconduct in [both] *Hardin*" and the instant case. Majority opinion at 271, 118 P.3d at 1214. If the mere fact that a claimant had intended to commit an act of serious misconduct was dispositive for purposes of HAR § 12–5–51(c), then Camara should have been denied unemployment benefits on those bases. Dissonant with its own reasoning, however, the majority agrees with the *Camara* holding. Majority opinion at 269–70, 118 P.3d at 1212–1213.

## III. *CONCLUSION*

Based on the foregoing analysis, I would (1) reverse the circuit court's (a) May 4, 2001 order affirming ESARO's Decision No. 0001888 and (b) May 4, 2001 final judgment and (2) remand this matter to the ESARO for entry of a decision in Medeiros's favor.